2020 IL App (4th) 180554

NO. 4-18-0554

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 26, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| SHANE A. WILLIAMS, | ) | No. 18CF17 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Diane M. Lagoski, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justice Cavanagh concurred in the judgment and opinion.
Justice Turner specially concurred, with opinion.

**OPINION**

¶ 1        In January 2018, the State charged defendant, Shane A. Williams, with one count

of armed violence (720 ILCS 5/33A-2 (West 2016)), one count of aggravated battery (great

bodily harm) (*id.* § 12-3.05(a)(1)), and one count of aggravated battery (public way) (*id.* § 12-

3.05(c)). The charges alleged that in November 2017, defendant kicked the victim, Shawn

Vanfleet, two times in the head on a public way in front of Player's Bar in Quincy, Illinois, and

because of that, Vanfleet sustained a cut to his lip and chin, as well as a seizure.

¶ 2        In June 2018, the trial court conducted defendant's jury trial at which the jury

found defendant not guilty of armed violence but guilty of both counts of aggravated battery. The

court sentenced defendant to six years in prison.

¶ 3        Defendant appeals, arguing that the evidence at trial was insufficient to prove him

guilty beyond a reasonable doubt as to either count of aggravated battery because the State failed to present any evidence that (1) defendant caused any of Vanfleet's wounds, (2) such wounds constituted great bodily harm, (3) Vanfleet was insulted or provoked by defendant, and (4) the location of the altercation was on a public way. Defendant further contends that (1) the State made improper arguments and asked improper questions and (2) defendant received ineffective assistance of counsel.

¶ 4        We disagree and affirm the trial court's judgment.

¶ 5                          I. BACKGROUND

¶ 6                          A. Procedural History

¶ 7        In January 2018, the State charged defendant with one count of armed violence (*id.* § 33A-2), one count of aggravated battery (great bodily harm) (*id.* § 12-3.05(a)(1)), and one count of aggravated battery (public way) (*id.* § 12-3.05(c)). The charges alleged that in November 2017, defendant kicked Vanfleet twice in the head on a public way in front of Player's Bar, and as a result, Vanfleet sustained a cut to his lip and chin, as well as a seizure.

¶ 8                          B. The Jury Trial

¶ 9        In June 2018, the trial court conducted defendant's jury trial.

¶ 10                        1. *Opening Statements*

¶ 11        The State began its opening statement by saying, "This is what Shawn Vanfleet looked like on December 23rd after the Defendant left him beaten, bruised, and bloody. This is Shawn Vanfleet, and this is what happens when the Defendant commits crimes." The State then explained that after Vanfleet was knocked unconscious, defendant got out of his vehicle and began to kick Vanfleet. The State reiterated this information several times in several different ways before stating that when a person takes those actions, "[t]hose are crimes in and of

themselves, but when you do that *** and you have a firearm, *** then it's a crime called armed violence."

¶ 12                                    2. *Shawn Vanfleet*

¶ 13        Shawn Vanfleet testified that on the evening of December 23, 2017, he went to a bar named Player's in Quincy, Illinois. While at Player's, Vanfleet saw defendant. Around 1 a.m., Vanfleet saw his ex-girlfriend, Jernada Harper, arguing with her new boyfriend, Robert Nichols, outside of the bar. At that time, Vanfleet could see defendant sitting in defendant's car. Vanfleet saw another person, whom he described as "a white guy," get out of defendant's car and begin "mouthing off to [Harper]." Vanfleet approached the man and began arguing with him. Eventually, Vanfleet turned his back to that individual and was "hit in the back of the head." Vanfleet was unable to remember much after that.

¶ 14        Vanfleet testified that he was knocked out and "went into a seizure," but he did not remember going into a seizure. The next thing he remembered after being punched was waking up outside of the bar as Harper was telling him to get into Robert Nichols's car so they could take him to the hospital. Vanfleet testified that, on the way, he had another seizure but did not remember it.

¶ 15        Vanfleet testified that prior to going to Player's that night, he did not have any injuries to his face or hands but when he woke up, he was injured. The State showed Vanfleet four photographs depicting his injuries. Vanfleet recognized the photographs as pictures of himself that showed the injuries to his face and hand that resulted from the attack. Vanfleet explained that "part of [his] lip was hanging off, like detached," and "it looked like a piece of bologna." Vanfleet also showed the jury a scar on his chin, which he said resulted from a wound he received that night.

¶ 16        On cross-examination, Vanfleet testified that there were two parking lots. "There's a side [parking lot] where the people at the Kroc Center park and there's that front part, like closest to Player's." He explained that defendant's vehicle was parked "in the second square, right next to Player's." Vanfleet saw defendant inside the car at the same time he was arguing with the unidentified white man. However, he did notice that defendant "was outside before [he] got sucker punched in the back of [his] head." Vanfleet explained that he was told that defendant participated in the attack. Vanfleet also varied between saying he did not talk to the police following the attack and saying he did remember talking to the police and telling them portions of his story.

¶ 17        On redirect examination, the State asked Vanfleet if he was "on the sidewalk or the street outside Player's" to which Vanfleet responded, "Yes, sir." The State then asked, "Fifth Street, which is open to the public, a public way, correct?" Again, Vanfleet responded, "Yes, sir."

¶ 18                                3. *Jernada Harper*

¶ 19        Jernada Harper testified that she was Vanfleet's ex-girlfriend and that defendant is her cousin. She stated that on the night in question, she was at Player's Bar with Robert Nichols and a few other friends. She also saw Vanfleet there. Around midnight, she was outside the bar, arguing with Robert when Vanfleet intervened. Another "white guy" was present as well, although Harper did not know who he was. She observed that the white man was in a car with defendant. During the argument, Harper and Nichols were standing "on the sidewalk right in front" on Fifth Street. She saw the white man argue with Vanfleet, and then the white man struck him in the head. Defendant then got out of the vehicle while people were helping Vanfleet get up. Harper said that defendant kicked Vanfleet three or four times in the head while the white

man continued to beat Vanfleet. Meanwhile, Nichols went to get his car. Defendant then approached Harper, pulled out a gun from the front of his pants, and told her to "back the fuck off." She testified the gun was silver in color.

¶ 20    Harper testified that, "[a]fter other people got involved," they were able to get Vanfleet into Nichols's vehicle to take him to the hospital. At this point, she did not know where defendant was. While in the vehicle, Vanfleet had a seizure for about two or three minutes and was spitting up blood. During the seizure, she saw Vanfleet's eyes roll back into his head while he began "shaking really badly."

¶ 21    On cross-examination, Harper agreed that she did not tell the police that defendant was her cousin and, in fact, told them that she had first met defendant that night. Harper explained that she only learned they were related after she spoke about him on the phone with her mother. Harper said that when defendant pointed the gun at her, he was between vehicles in the parking lot, she was standing on a ledge between the parking lot and the sidewalk, and Vanfleet "was in between the vehicles where [defendant] was standing." She then confirmed that the parking lot was the one next to Player's Bar. Harper also said that the last time she had seen a gun was when she was five or six years old.

¶ 22                          4. *Robert Nichols*

¶ 23    Robert Nichols testified that on November 23, 2017, he was dating Harper and they went to Player's Bar. Nichols stated that he "stayed in the car because [he] didn't really want to go into Player's because of all the drama that happens there." He got into an argument with Harper outside of the bar. He saw that Vanfleet and a white man were arguing. The white man was with defendant. When Vanfleet turned away from the white man, the white man hit Vanfleet in the back of his head. Nichols saw Vanfleet fall to the ground and then defendant got

out of his car and kicked Vanfleet three times. Nichols got the car, and then he and Harper drove Vanfleet to the hospital. While in the car, Harper told Nichols that defendant pointed a gun at her. Also while en route to the hospital, Vanfleet had a seizure. The State asked Nichols if defendant kicked Vanfleet while Vanfleet laid "on the sidewalk area outside Player's on Fifth Street." Nichols replied that it happened in the "parking lot area" and Vanfleet was "between two cars."

¶ 24        On cross-examination, Nichols testified that he saw defendant kick Vanfleet twice in the side and once in the head. Nichols also explained that while he was driving Vanfleet to the hospital, he glanced back once and saw Vanfleet shaking.

¶ 25                          5. *Officer Andrew Cox*

¶ 26        Andrew Cox testified that he was an officer for the Quincy Police Department, and on December 23, 2017, he went to the emergency room at Blessing Hospital. Cox was the person who took the photographs of Vanfleet's injuries. Cox said, "When I first observed Vanfleet, he had blood all over his face, his pants and his shirt. I observed a cut under his chin and on his lip." Cox explained that he took the photographs after the hospital staff had cleaned most of the blood off of Vanfleet, but originally there was much more blood on him.

¶ 27                  6. *The Discussion Prior to the Jury Instruction Conference*

¶ 28        Following the State's evidence, the trial court asked defendant if he wished to testify. Defendant replied, "Yes, it's still my wish not [to] testify." However, defendant then followed that statement by saying, "And none of my witnesses are being questioned or called to the stand either." Defendant then told the court, "Your honor, I want to ask one more question." However, the court interrupted, saying, "We are going to proceed then, I think, to formal jury instruction conference."

¶ 29                                   7. *Closing Arguments*

¶ 30          The State began its closing argument by telling the jury that Vanfleet did nothing wrong during the events preceding his attack. The State argued, "[A] seizure, a torn off lip, lying bruised and bloodied and battered, and that was his Christmas present." The State described Vanfleet's lip as "torn from his face."

¶ 31          The State argued that it had proved defendant kicked Vanfleet in a public way because "[i]t all happened outside of Player's. And we have multiple witnesses who saw the defendant do it and said it was the defendant." The State said, "Either those three [witnesses] are telling you the truth about what they saw and what happened or every one of them is a liar because that's it. It's either one or the other."

¶ 32          Defendant argued that no evidence tied the seizures to defendant's kicking Vanfleet. Defendant also argued that Vanfleet's injuries constituted bodily harm, not great bodily harm. Defendant pointed out some discrepancies in the testimony, such as that (1) different witnesses claimed there were anywhere from two to four kicks and (2) Harper claimed she did not know defendant but then said on the stand they were cousins. Defendant argued that the State had failed to meet its burden of proof and suggested that there was more to the story than what the State had presented.

¶ 33          In rebuttal, the State accused defendant of "twist[ing] the evidence so it suits them." The State argued that despite defendant's pointing out that the fight took place at midnight and therefore it was dark out, there were lights. The State argued, "And that's what the defense is trying to do, trying to point out the little things and ignore the important stuff." In response to defendant's suggestion that there was more to the story, the State told the jury that defendant had the same opportunity to present evidence as the State. The State then said,

"What's really going on here is clear. The defendant did something wrong and he's trying to get away with it. He knows what he did."

¶ 34　　　　The jury found defendant guilty of both counts of aggravated battery, but not guilty of armed violence.

¶ 35　　　　　　　　　　　C. Posttrial Motions and Sentencing

¶ 36　　　　Following trial, defendant filed a posttrial motion in which he argued that the State (1) failed to prove him guilty beyond a reasonable doubt, (2) improperly impugned the integrity of the defense with the accusation of "twisting" evidence, and (3) implied defendant had an obligation to present evidence by commenting on defendant's ability to call witnesses.

¶ 37　　　　At the hearing on the motion, the State argued defendant did not object to the comment regarding defendant's ability to present evidence at the time it happened at trial. Regarding the "twisting" evidence comment, the State argued that it "could have gone farther" because defendant invited the response by claiming a witness could not see because it was dark at midnight. The trial court denied the posttrial motions.

¶ 38　　　　In August 2018, the trial court conducted defendant's sentencing hearing. The court ultimately merged both counts of aggravated battery and sentenced defendant to six years in prison.

¶ 39　　　　This appeal followed.

¶ 40　　　　　　　　　　　　　　II. ANALYSIS

¶ 41　　　　Defendant appeals, arguing that the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt as to either count of aggravated battery because the State failed to present any evidence that (1) defendant caused any of Vanfleet's wounds, (2) such wounds constituted great bodily harm, (3) Vanfleet was insulted or provoked by defendant, and (4) the

location of the altercation was in a public way. Defendant further contends that (1) the State made improper arguments and asked improper questions and (2) defendant received ineffective assistance of counsel.

¶ 42                    A. The State's Evidence Was Sufficient

¶ 43        Defendant first contends that the State failed to present sufficient evidence to prove him guilty beyond a reasonable doubt as to either theory of aggravated battery because no evidence exists showing that (1) defendant caused any of Vanfleet's wounds, (2) such wounds constituted great bodily harm, (3) Vanfleet was insulted or provoked by defendant, and (4) the location of the altercation was in a public way. We disagree and conclude that sufficient evidence exists that defendant contacted Vanfleet in an insulting or provoking manner on or about a public way. Because defendant's aggravated battery convictions merged, we need not consider the arguments related to causation or great bodily harm.

¶ 44                    1. *The Law*

¶ 45        "The State bears the burden of proving each element of an offense beyond a reasonable doubt." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 54, 126 N.E.3d 703 (citing *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876).

> "When a defendant challenges his conviction arguing that the evidence was not sufficient to prove him guilty, a reviewing court must (1) consider all of the evidence in the light most favorable to the State and (2) determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citing *People v. Brown*, 2013 IL 114196, ¶ 48, 1 N.E.3d 888).

¶ 46        "It remains the firm holding of [the Illinois Supreme Court] that the testimony of

a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242 (2009). "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. " 'Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses.' " *Sturgeon*, 2019 IL App (4th) 170035, ¶ 55 (quoting *People v. McGath*, 2017 IL App (4th) 150608, ¶ 26, 83 N.E.3d 671).

¶ 47        "A reviewing court will not reverse a defendant's conviction 'simply because there is contradictory evidence or because the defendant claims a witness was not credible.' " *Id.* ¶ 56 (quoting *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 17, 985 N.E.2d 1047). Instead, a reviewing court will reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Id.*

¶ 48                                    2. *This Case*

¶ 49        First, we conclude that there was sufficient evidence to conclude that defendant made "physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3 (West 2016). Defendant argues that a person cannot make contact of an insulting or provoking nature with an individual who is already unconscious. We disagree.

¶ 50        The plain language of the statute applies the terms "insulting or provoking" to the type of contact, not to the reaction of the victim. In other words, the jury should determine if the contact was of the sort that *would* be insulting or provoking. If the legislature intended to criminalize this conduct only if the victim actually was insulted or provoked, it could have used the same style of language as it did for battery involving bodily harm. For bodily harm, the

statute says, "causes bodily harm to an individual." *Id.* The legislature could have just as easily said, "causes an individual to be insulted or provoked," but it did not. Because of these considerations, we conclude that whether the victim, in fact, was able to be insulted or provoked is immaterial. Any person would know that when defendant kicked Vanfleet, that was "physical contact of an insulting or provoking nature" at minimum, and the jury was entitled to come to that conclusion.

¶ 51    If we were to agree with defendant, it would produce absurd results. A defendant could spit on a victim who is unconscious or unaware with impunity. We conclude that the law criminalizing battery protects the sedated person in a hospital bed, or the drunkard passed out in the gutter, in the same manner that it protects other persons in perfect control of their faculties of perception.

¶ 52    We note that defendant cites a case from the Second District that stated, "However, the statute's plain language defines the offense in terms of contact that insults or provokes the victim, not contact that injures the victim." *People v. DeRosario*, 397 Ill. App. 3d 332, 334, 921 N.E.2d 753, 755 (2009). That case does not support defendant's position because the Second District was merely illustrating that "insulting or provoking" battery does not require any kind of injury. Insofar as the Second District may have endorsed the notion that a victim must in fact be subjectively insulted or provoked, we decline to follow the Second District's reasoning.

¶ 53    Second, we conclude that there was sufficient evidence for the jury to conclude that the contact took place on *or about* a public way. We agree with defendant that much of the testimony seemed to indicate that the fight took place in the parking lot to the side of Player's Bar. Further, the argument that resulted in the fight took place on the sidewalk, which gives rise

- 11 -

to a reasonable inference that the fight was close to the sidewalk. The jury did not need to conclude that defendant kicked Vanfleet directly on a public way, but instead that he did so on *or about* a public way. "The legislature purposely chose terms with this flexibility in order to insure the broad protection of the public health and safety. Had the legislature intended to specify an exact demarcation, they would have drafted the statute without adding the words 'or about' to follow the word 'on.' " *People v. Lowe*, 202 Ill. App. 3d 648, 654, 560 N.E.2d 438, 442 (1990). Under the facts of this case, we conclude that even if defendant kicked Vanfleet in the parking lot, instead of the sidewalk or the street, his doing so would be sufficient for the jury to conclude that the location was "about" a public way.

¶ 54    Viewing the evidence in the light most favorable to the State, a reasonable jury could find defendant guilty of aggravated battery (public way).

¶ 55                    B. The State's Arguments Were Proper

¶ 56    Defendant next argues that the State denied defendant "a fair trial by misstating the applicable law, inflaming the jury's passions, and focusing them on collateral issues." Defendant concedes that the issue was not preserved but argues that the misconduct amounted to plain error.

¶ 57                    1. *The Law*

¶ 58    The Illinois Supreme Court has articulated the plain-error doctrine as follows:

> "The plain-error rule bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved claims of error in specific circumstances. [Citation.] We will apply the plain-error doctrine when:
>
>> (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against

- 12 -

the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010).

¶ 59 "The usual first step under either prong of the plain-error doctrine is to determine whether there was an error at all." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 74, 115 N.E.3d 1148. "The defendant bears the burden of persuasion at all times under the plain error doctrine." *Id.* ¶ 75.

¶ 60                                         2. *This Case*

¶ 61 Defendant argues that the State acted improperly by (1) showing photographs of Vanfleet's injuries and saying "this is what happens when the defendant commits crimes" during opening statements, (2) insinuating that defendant intimidated other witnesses, (3) calling on the jury to "send a message" or "take a stand" against crime with its verdict, (4) "attempting to focus the jury's outrage on defendant for kicking someone while they were down," (5) arguing "the only way to find [defendant] not guilty would be to find that all of the State's witnesses were lying," and (6) accusing defense counsel of twisting the evidence. Defendant further argues that the trial court had an independent duty to stop the State's allegedly improper arguments.

¶ 62                a. Showing Exhibits to the Jury not yet Admitted During Opening Statement

¶ 63 A strange aspect of this case is that the prosecutor showed the jury photographs of the victim's injuries during his opening statement. When the prosecutor did so, those photographs had not yet been offered into evidence by the prosecutor, and the trial court had not

- 13 -

yet ruled that they would be admissible. Of course, given that no evidence had yet been presented, no foundation at that point could have been laid for their admissibility.

¶ 64 The prosecutor may well have believed that these photographs were surely to be admitted in due course, as ultimately they were, but that belief does not overcome the problematic nature of showing the photographs during opening statement. After all, no matter how sincere the prosecutor's belief in the photographs' ultimate admissibility may have been, his belief may have proved to be wrong. That is, if the court were to find some deficiency in the foundation laid for the admission of the photographs or to conclude that they were just too prejudicial to be displayed to the jury, the prosecutor's showing these photographs to the jury during his opening statement would have resulted in his revealing—and highlighting—evidence in his opening statement that ultimately would not even be admitted.

¶ 65 Typically, lawyers should not show physical evidence to the jury during opening statements. Given the limited purpose of an opening statement—namely, to merely acquaint the jury with what a lawyer believes the evidence will be—usually no need exists to use physical evidence when a lawyer is making an opening statement. And, even in the absence of an objection, trial courts should inquire of a lawyer who looks like he or she is about to use physical evidence in the lawyer's opening statement to ask what counsel is intending to do with the physical evidence, and, perhaps, direct counsel to refrain from doing so.

¶ 66 In the unlikely event that a lawyer has a case in which, for tactical reasons, the lawyer believes showing physical evidence to the jury during opening statement is important, then the lawyer should call the matter to the attention of the trial court, perhaps during a pretrial conference or in a motion *in limine*, to alert the court and opposing counsel of what that lawyer intends to do in opening statement. A trial court always possesses the discretion to rule in

advance on the admissibility of physical evidence, and opposing counsel might not even object to the admissibility of the item in question. Had the prosecutor done so in this case, and had the court ruled (as it ultimately did) that the photographs were admissible, no question would have arisen about the propriety of the prosecutor's using the photographs during his opening statement.

¶ 67         b. Defendant's Claims About the State's Arguments in This Case

¶ 68         Notwithstanding the foregoing, there is nothing inherently improper with showing a photograph of the victim's injuries and saying that "this is what happens when the defendant commits crimes." We disagree with defendant's contention on appeal that the State was implicitly arguing that defendant had a history of violent crime and that the injuries were consistent with those other crimes. Defendant was in fact charged with multiple crimes, and the State sought to prove that Vanfleet's injuries resulted from those crimes. The State never argued or even mentioned that defendant had any convictions.

¶ 69         Next, defendant claims the State improperly insinuated that defendant intimidated other witnesses. However, defendant objected to the State's questions about why other witnesses were unable or unwilling to talk to police, and the trial court sustained those objections. Because of this, defendant has already received his remedy.

¶ 70         Defendant further asserts that many parts of the State's closing argument were improper. "Generally, prosecutors have wide latitude in the content of their closing arguments." *People v. Jackson*, 2020 IL 124112, ¶ 82; see also *People v. Neal*, 2020 IL App (4th) 170869, ¶ 166. "They may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. A reviewing court will consider the closing argument as a whole, rather than focusing on selected

phrases or remarks." *Jackson*, 2020 IL 124112, ¶ 82. "A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error." *Id.* ¶ 83.

¶ 71 We conclude that in relation to the alleged improprieties in the State's closing argument, none of the identified errors were so egregious—on their own or taken together—that "real justice was denied or the verdict resulted from the error." *Id.* In so concluding, we reiterate that "trying felony cases before a jury 'ain't beanbag.' " *People v. Hubner*, 2013 IL App (4th) 120137, ¶ 33, 986 N.E.2d 246. Instead, as we have noted in the past:

> "[F]elony criminal trials are serious matters with high stakes, and we expect advocates in our adversarial system of justice—both prosecutors and defense attorneys—to 'use all of their forensic skills to persuade the jury of the wisdom or justice of their respective positions.' [Citation.] We continue to be disinclined to become the 'speech police' by imposing unnecessary restrictions upon closing arguments in criminal cases, and we encourage counsel to vigorously advocate for their position." *Id.* (quoting *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 28, 963 N.E.2d 394).

¶ 72 Accordingly, we conclude that the State's arguments were not improper, and we continue to encourage vigorous advocacy from both sides in closing arguments.

¶ 73                                   3. *What Is Misconduct?*

¶ 74 Defendant describes the State's alleged errors as "misconduct" on multiple occasions, and we now wish to delineate misconduct from mere error. Black's Law Dictionary defines "misconduct" as "dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust," and, "An attorney's dishonesty or attempt to

- 16 -

persuade a court or jury by using deceptive or reprehensible methods." Black's Law Dictionary (11th ed. 2019). This court considers actions, such as *Brady* violations or *Batson* violations, to be misconduct. Even taken as true, this court would not consider defendant's allegations in this case to constitute prosecutorial misconduct.

¶ 75　　　　By way of explaining why we reject defendant's characterization of the prosecutor's closing argument, we ask the following: When a trial judge makes an erroneous ruling, is that judicial misconduct? Or when defense counsel asks an improper question, is that attorney misconduct? With very rare exceptions, the answer is no. The same thinking should apply to claims that the prosecutor did something erroneous. We encourage defendants to allege prosecutorial misconduct occurred only when the circumstances justify that pejorative description.

¶ 76　　　　　　　　　　C. Defendant Received Effective Assistance of Counsel

¶ 77　　　　Defendant argues that his trial counsel was ineffective because counsel (1) allowed irrelevant, unreliable, and prejudicial testimony into evidence without objection and (2) failed to draw the trial court's or jury's attention to the State's failure to prove essential elements of the offenses. We further note that defendant alleges counsel was ineffective for not objecting to the State's opening statement and closing argument, but we conclude that the statements were not objectionable for the same reasons articulated previously.

¶ 78　　　　　　　　　　　　　　1. *The Law*

¶ 79　　　　All defendants enjoy the constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Pope*, 2020 IL App (4th)

180773, ¶ 61.

¶ 80    To establish deficient performance, a defendant must show his counsel's performance fell below an objective standard of reasonableness. *Id.* ¶ 62. It is not sufficient for a defendant to show that counsel's representation was imperfect because the constitution guarantees only a reasonably competent counsel. *Harrington v. Richter*, 562 U.S. 86, 110 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Instead, a defendant must show his counsel's representation undermined the proper functioning of the adversarial process to such an extent that the defendant was denied a fair trial. *Id.* (citing *Strickland*, 466 U.S. at 686).

¶ 81    To show prejudice, a defendant must demonstrate "that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36, 987 N.E.2d 767 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601.

¶ 82                                    2. *This Case*

¶ 83    Defendant claims that trial counsel let in "irrelevant, unreliable and prejudicial testimony" without objection. First, defendant argues that counsel should have objected to the State's "repetition of the inflammatory and collateral factor of kicking someone while they were down and helpless." We disagree. The State was entitled to draw the jury's attention in its closing argument to the facts brought out through testimony, which included that Vanfleet was defenseless on the ground when defendant kicked him. Therefore, trial counsel could not be ineffective for failing to object.

¶ 84    Second, defendant contends that trial counsel should have objected to the leading question to Vanfleet about the location of the attack. At trial, the State asked Vanfleet if he was "on the sidewalk or the street outside Player's." Vanfleet responded, "Yes, sir." The State then asked, "Fifth Street, which is open to the public, a public way, correct?" Again, Vanfleet responded, "Yes, sir." Although the trial court likely would have sustained an objection that the question was leading, we conclude that defendant was not prejudiced by counsel's failure to object.

¶ 85    As we discussed previously in paragraph 53, even assuming that Vanfleet's testimony that he was kicked on a public way was not introduced into evidence, the jury still had sufficient evidence to conclude that the kick took place *about* a public way. In fact, the majority of the evidence relating to the location of the attack indicated it occurred in the parking lot, which makes it likely that the jury (1) thought the location was in the parking lot and (2) concluded that the parking lot was *about* a public way. For this reason, we conclude that that the likelihood of a different result absent the failure to object is not substantial, as required. See *Domagala*, 2013 IL 113688, ¶ 36.

¶ 86                                III. CONCLUSION

¶ 87    For the reasons stated, we affirm the trial court's judgment.

¶ 88    Affirmed.

¶ 89    JUSTICE TURNER, specially concurring.

¶ 90    While I agree that this court should affirm the trial court's judgment, I disagree with certain parts of the majority analysis. Thus, I specially concur.

¶ 91    First, I neither understand the point of paragraphs 73 through 75 of the majority opinion (*supra* ¶¶ 73-75) nor do I find those paragraphs necessary to resolve this appeal.

Accordingly, I do not concur in those paragraphs.

¶ 92         Second, unlike the majority, I *do* find parts of the State's closing argument to be improper. As an example, the prosecutor told the jury defendant "pointed [a gun] at Jernada and told her to back the fuck off. She didn't. And the police didn't. And our office didn't. Now is the same time for you folks to take a stand and say no, we're not going to back off." In my view, this is an "us vs. them" argument, and I therefore disagree with paragraph 72, where the majority concludes that the "State's arguments were not improper." *Supra* ¶ 72. However, I do not find the improper argument rises to the level of plain error.

¶ 93         Third, I believe the majority analysis needlessly complicates the rationale that supports the jury finding defendant guilty of battery under section 12-3(a)(2) of the Criminal Code of 2012 (720 ILCS 5/12-3(a)(2) (West 2016)). *Supra* ¶ 50. The plain language of the statute requires that the insulting or provoking contact must be made with an individual, and the individual is of course the victim. See Illinois Pattern Jury Instructions, Criminal, No. 11.06, Committee Note, at 450 (4th ed. 2000) ("Insert in the blank the name of the victim.") Thus, simply stated under the facts here, the jury could have found defendant's contact was insulting or provoking to the victim even though the victim was unconscious and unaware he was being insulted or provoked at the time defendant knowingly made the contact. It is well recognized that a jury can infer insulting or provoking contact even when the victim does not testify that he or she was insulted or provoked. See *People v. Nichols*, 2012 IL App (4th) 110519, ¶ 42, 979 N.E.2d 1002. As the majority correctly notes, "[a]ny person would know that when defendant kicked Vanfleet, that was 'physical contact of an insulting or provoking nature' at minimum, and the jury was entitled to come to that conclusion." *Supra* ¶ 50.

¶ 94         Finally, I recognize that the majority needed to address *DeRosario* because

defendant cited it in support of his position. However, after distinguishing *DeRosario*, the majority then makes the following comment: "Insofar as the Second District may have endorsed the notion that a victim must in fact be subjectively insulted or provoked, we decline to follow the Second District's reasoning." *Supra* ¶ 52. As part of my special concurrence, I note my disagreement with the aforementioned comment.

**No. 4-18-0554**

| | |
|---|---|
| **Cite as:** | *People v. Williams*, 2020 IL App (4th) 180554 |
| **Decision Under Review:** | Appeal from the Circuit Court of Adams County, No. 18-CF-17; the Hon. Diane M. Lagoski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Bryan JW McIntyre, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Gary L. Farha, State's Attorney, of Quincy (Patrick Delfino, David J. Robinson, and Luke McNeill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |