NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190079-U

NO. 4-19-0079

FILED
February 23, 2021
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHAD ERIC WHEELER, Defendant-Appellant. | ) Appeal from the ) Circuit Court of ) McLean County ) No. 18CF537 ) ) Honorable ) J. Casey Costigan, ) Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1  *Held:*  The appellate court affirmed the trial court's judgment because the evidence at trial was sufficient to sustain defendant's convictions and the State did not engage in "prosecutorial misconduct."

¶ 2  In May 2018, the State charged defendant, Chad Eric Wheeler, with (1) aggravated domestic battery, a Class 2 felony with Class X sentencing due to his prior record (720 ILCS 5/12-3.3(a-5) (West 2016)), (2) misdemeanor battery (*id.* § 12-3(a)(1)), and (3) misdemeanor aggravated assault (*id.* § 12-2(c)(1)). The charges alleged generally that earlier that month, defendant choked his fiancée, Ashley Williams, and placed Nathan Goembel in reasonable apprehension of a battery by threatening to beat him up while holding a knife.

¶ 3  In September 2018, the trial court conducted defendant's jury trial at which the jury found him guilty of aggravated domestic battery and aggravated assault but not guilty of battery. The court later sentenced defendant to 14 years in prison for aggravated domestic battery and

merged his conviction for aggravated assault.

¶ 4　　　　Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt of (a) aggravated domestic battery and (b) aggravated assault and (2) the prosecutor engaged in "misconduct" by eliciting testimony that defendant had committed prior acts of domestic violence in violation of the procedures set forth in section 115-7.4 of the Code of Criminal Procedure of 1963 (Code). 725 ILCS 5/115-7.4 (West 2018). We disagree and affirm.

¶ 5　　　　　　　　　　　　　I. BACKGROUND

¶ 6　　　　　　　　　　　　A. Pretrial Proceedings

¶ 7　　　　In May 2018, the State charged defendant with (1) aggravated domestic battery, a Class 2 felony with Class X sentencing due to his prior record (720 ILCS 5/12-3.3(a-5) (West 2016)), (2) misdemeanor battery (*id.* § 12-3(a)(1)), and (3) misdemeanor aggravated assault (*id.* § 12-2(c)(1)). The charges alleged generally that earlier that month, defendant choked his fiancée, Ashley Williams, and placed Nathan Goembel in reasonable apprehension of a battery by threatening to beat him up while holding a knife.

¶ 8　　　　In September 2018, defendant filed a motion *in limine* in which he sought to bar the State from presenting any evidence of his prior conviction or imprisonment for first degree murder. Defendant also moved to exclude any evidence or testimony that he told the police he had been to prison, was going back to prison, or had been in any other fights. The State moved pursuant to section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2018)) to introduce evidence of defendant's murder conviction. However, the court granted defendant's motions and denied the State's motion.

¶ 9　　　　　　　　　　　　　B. The Jury Trial

¶ 10　　　　In September 2018, the trial court conducted defendant's jury trial. Ashley

Williams testified that she was defendant's fiancée. She began dating defendant in September 2017 and described their relationship as "amazing." In January 2018, Williams learned that defendant had an affair with another woman, but Williams did not end their relationship. Williams said that she and defendant were only occasional drinkers and alcohol tended to give her "a very short fuse" and caused her to do things she would later regret.

¶ 11 In May 2018, Williams and defendant met at Williams's home at 8 p.m. and began to drink rum. At 10 or 10:30 p.m., they went to a nearby bar. Defendant drank three bottles of beer and about seven Jägermeister shots of alcohol. Williams drank three beers and had two shots of alcohol.

¶ 12 At one point, Williams and defendant went outside to smoke. Williams asked defendant about his affair because she noticed that the woman he had an affair with appeared on his Snapchat. (Snapchat is a popular phone application that allows users to send photos and messages to other users.) Defendant became angry and said he was tired of hearing about it. At around 12:30 a.m., defendant walked alone back to Williams's house, and Williams followed shortly afterwards.

¶ 13 Williams testified that when she arrived home, defendant was upstairs in bed. Williams asked him again about his mistress, and defendant again said he was tired of hearing about it. Williams went downstairs and drank half of a bottle of rum. A short time later, defendant got up and went downstairs to the kitchen. Williams's phone rang, which made defendant angry because he thought Williams was still talking to her ex-husband. Defendant grabbed the phone and broke it. Williams said that defendant did not grab her neck, choke her, or throw her to the ground. Defendant went outside and began putting air in the tires of his bicycle. Williams walked back to the bar and asked the bar owner to call her friend, Shelbi Carmona, for her so that Carmona could

come to her house and help mediate the conflict between Williams and defendant.

¶ 14 Williams testified that Carmona met her at the bar and the two drove back to Williams's house. Williams acknowledged that she told Carmona that defendant choked her, although she did not remember saying that she felt like her neck had been broken. Once inside the home, Williams did laundry while Carmona stood guard at the door. Defendant came inside and began to argue with Carmona, who tried to prevent defendant from going upstairs to get his clothes. Williams explained that defendant did not threaten Williams or Carmona, nor did he throw Carmona to the ground. Although Williams did not observe it, she heard defendant yell that Carmona had kicked him in the groin.

¶ 15 Williams testified further that Carmona called her friend, Nathan Goembel, and asked him to come over. Goembel arrived a short time later accompanied by Jack Anderson, the owner of the bar. Goembel and Anderson got out of a truck and stood on the sidewalk in front of Williams's house. Eventually, Williams and Carmona went outside and joined them. While standing on the sidewalk, Williams saw defendant inside the house in the doorway with a serrated, six-inch bread knife in his hand. Williams testified that Carmona called the police. Defendant left the house through a different doorway and walked down the street while carrying a duffel bag containing clothing.

¶ 16 Williams testified that before the police arrived, Carmona suggested that she and Williams smack each other and put marks on each other to make their story of abuse more believable to the police. Williams smacked Carmona on the arm and shot the window of defendant's truck with a BB gun.

¶ 17 Later, two police officers arrived at Williams's home, and she spoke with an officer named Erickson. Williams testified that she told Erickson defendant grabbed her by the neck,

threw her to the floor, and choked her until she almost lost consciousness. However, Williams testified that what she told Erickson was false and that defendant did not choke her or throw her to the ground.

¶ 18    Williams also testified that she refused medical treatment but allowed Erickson to take photographs of her alleged injuries. Williams claimed that the marks displayed in the photographs were marks from consensual sex with defendant. Williams said that she enjoyed and consented to being bitten and choked during consensual sex and that this happened frequently. Williams acknowledged that she "possibly" told Erickson the mark in one of the photographs was a choke mark. Williams also identified a photograph that was taken on the night of the incident in which defendant is biting Williams's neck and Williams is smiling. Williams denied telling Carmona that the incident was her own fault for allowing defendant to drink.

¶ 19    Williams explained that some days after the incident, she told a police officer named Hodges that the account she gave on the night of the incident was inaccurate. Williams also testified that in June 2018, she attempted to contact the state's attorney's office and provide a written recantation of the statement she gave to the police but the person at the office did not accept her paperwork.

¶ 20    Later in June 2018, Williams visited the police department and spoke with a detective named Evan Henkel. She told him that defendant never put his hands on her and that she lied about the incident out of drunken "anger and spite." Williams told Henkel that the marks on her neck were from consensual sexual activity that occurred before she and defendant went to the bar. Williams acknowledged telling Henkel that there were periods that night when she blacked out. Williams denied telling Henkel that there were many things she could not remember due to blackouts from drinking, including whether defendant put his hands on her. Williams recalled

telling Henkel that defendant wrote her a letter but denied telling him that it was an apology letter. Williams also denied that defendant's family influenced her recantation but acknowledged that she came to court on eight different pretrial status dates accompanied by defendant's mother.

¶ 21 Shelbi Carmona testified that she and Williams were friends at the time of the incident but Carmona had since ended their friendship. Carmona said that Williams drank a lot and defendant drank with her. Carmona was sometimes present when Williams and defendant argued. The arguments were "scary" and sometimes involved shoving.

¶ 22 At 11:30 p.m. on May 25, 2018, Carmona got a call from Jack Anderson, the owner of a bar called The Town Well. Carmona drove to the bar where she found Williams crying hysterically. Carmona said that Williams claimed defendant had choked her and that Williams thought her neck was broken. Williams was holding her neck and had difficulty turning it. Williams said she was scared and did not know what to do. The two of them then went to Williams's house.

¶ 23 When they arrived, defendant was outside working on a bicycle. They went inside and defendant tried to go inside as well. Defendant began yelling, and Carmona tried to block him and push him back as he attempted to get to Williams. Carmona repeatedly asked defendant to leave the house, but defendant replied that it was his house and he could do what he wanted. Eventually the three of them were in the laundry room where Williams collected clothing. Defendant tried again to push past Carmona, and Carmona threatened to call the police. Carmona claimed defendant responded, "[T]hat's fine because I'll have you dead before they get here." Carmona testified that defendant grabbed her by the arm and neck and threw her to the ground, causing her to scrape her arm.

¶ 24 Carmona testified that defendant left the house while Williams and Carmona

finished packing. Carmona called Anderson for assistance with de-escalating the situation. Defendant went back inside the house, and Williams and Carmona went outside to wait for Anderson. When Anderson arrived with Nathan Goembel, they got out of a truck and stood on the sidewalk outside the house alongside Williams and Carmona. Defendant came out of the house and stood on the porch in front of the front door. Defendant was holding a kitchen knife, which he smacked against his leg while he threatened that he could kill everyone present if he wanted to. Defendant did not leave the porch or approach the group, and the group remained where they were on the sidewalk. Defendant went back inside before he exited again with a duffel bag and left.

¶ 25　　　　Carmona testified that she and Williams went inside the house and waited for the police to arrive. Williams said that she was done with defendant and wanted him locked up. Williams suggested smacking Carmona on the back to leave marks that they could blame on defendant. Carmona responded that they already had marks, but Williams said it would be better if they had more and smacked Carmona under her shoulder blade. The police then arrived and took statements and pictures. The next day, Williams borrowed Carmona's car to go to the doctor for her neck. When she returned, Williams asked Carmona not to press charges and said it was her own fault because she let defendant drink liquor.

¶ 26　　　　Carmona acknowledged that Williams had told her that she sometimes likes to "get rough" during sex with defendant, including mutual choking. Carmona also testified as follows:

> "Q. [D]id Ashley tell you that the defendant was violent?
>
> A. I mean not during—I mean not the sex stuff or anything but—
>
> Q. But against her will, did Ashley tell you that the defendant choked her?
>
> A. Not in the beginning, but later on, yeah.
>
> Q. *** [D]id Ashley ever tell you that the defendant was violent towards

her and [that] he had choked her and strangled her?

A. Outside of sex?

Q. Yes.

A. Yes.

Q. And how many times was this?"

¶ 27    Defendant then objected and the trial court sustained the objection. Outside the presence of the jury, the court admonished the State that this line of questioning circumvented the requirements of section 115-7.4 of the Code because the court did not have the opportunity to weigh possible prejudice.

¶ 28    Nathan Goembel testified that he was friends with Carmona, knew Williams, and had met defendant twice before. Goembel said he was at a bar on May 26, 2018, with Jack Anderson when one of them received a phone call from Carmona. They went to Williams's house and parked Anderson's truck outside. They joined Carmona and Williams on the sidewalk. Defendant was on the front porch of the house and was holding a knife. Defendant smacked the knife against his leg, and Goembel recalled defendant said "something along the lines of I'm going to kick your ass." Goembel said he felt a little nervous because defendant could run at him or do something else to the other people standing around. Goembel acknowledged that defendant remained on the porch and never attempted to close the distance between himself and the people on the sidewalk. Goembel did not leave or back away. Eventually, defendant went back inside, got some bags, and began to leave. The police arrived shortly thereafter.

¶ 29    Edward Hodges testified that he was a deputy with the McLean County Sheriff's Office and he went to Williams's house for a domestic dispute call. Hodges spoke with Williams and Goembel. Williams seemed intoxicated, but Goembel appeared sober. Hodges observed that

Williams was distraught and crying. Williams told him that she had an argument with her boyfriend, that it escalated to a physical altercation, and that he grabbed her, threw her to the ground, and then choked her. Hodges photographed Williams's injuries.

¶ 30 Andrew Erickson testified that he was a deputy with the McLean County Sheriff's Office and he was called to Williams's house but on the way encountered defendant, who was walking down the road. Erickson placed defendant in his squad car and asked him what had happened. Defendant told him that he and Williams had a drunken argument but it never became physical. Defendant said he broke his phone as he walked outside the house. Defendant said Williams's friends arrived, which agitated him, so he thought it best to leave for a while. He told one of the men who arrived that he would "beat his ass" if he came inside the house.

¶ 31 Erickson went to Williams's residence, and she also told him that defendant had grabbed her, thrown her to the floor, and strangled her. She also told him that defendant strangled her until she was unconscious. Williams told Erickson that defendant was frequently violent when he drinks and, regarding their relationship, "when it's good, it's so good, but when it's bad it's like this." Erickson testified he arrested defendant, who became upset and "made statements that he was going to kill everybody in the house including the dogs and specifically named [Carmona] on the front porch if he was ever released."

¶ 32 About 15 minutes after arriving at the police station, Erickson again spoke with defendant, and at one point, defendant said it would be easy to "come up with a story" for the police. Defendant then gave a different explanation of what happened, stating that he returned home from the bar and went to bed. Williams came into the bedroom and smacked and choked him. He and Williams went around the house striking each other. When Carmona arrived, he was trying to get his clothes so he could leave. Carmona blocked his way and kicked him in the crotch

and stomach. As defendant recounted the incident to Erickson, "He had made statements that he—she was going to be somebody that he was going to kill." Defendant was leaving when he noticed two men get out of a truck parked outside the residence. The men told defendant they were there because he was acting up. Defendant said that if there was a problem, they should "come up here," which he acknowledged was an invitation to fight. Defendant recalled telling the men he would "beat their ass" but then went back inside. Defendant initially said he did not touch a knife but later said he had used a knife earlier that day to make a sandwich.

¶ 33    Evan Henkel testified that he was a deputy with the McLean County Sheriff's Office and spoke with Williams when she came to the police station in June 2018. He recalled that Williams stated she had received an apology letter from defendant.

¶ 34    The jury found defendant guilty of aggravated domestic battery and aggravated assault but not guilty of battery. The trial court later sentenced defendant to 14 years in prison for aggravated domestic battery and merged his conviction for aggravated assault.

¶ 35    This appeal followed.

¶ 36                                II. ANALYSIS

¶ 37    Defendant appeals, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt of (a) aggravated domestic battery and (b) aggravated assault and (2) the prosecutor engaged in "misconduct" by eliciting testimony that defendant had committed prior acts of domestic violence in violation of the procedures set forth in section 115-7.4 of the Code. We disagree and affirm the trial court.

¶ 38    A. The Evidence Was Sufficient to Support Defendant's Convictions

¶ 39    Defendant contends that the State failed to present sufficient evidence to prove defendant guilty beyond a reasonable doubt of aggravated domestic battery because (1) Williams

recanted her allegation that defendant choked her and (2) Williams's prior inconsistent statements implicating defendant were admitted only as impeachment. Defendant contends that the State also failed to prove defendant guilty of aggravated assault because Goembel was not placed in reasonable apprehension of an imminent battery. We disagree.

¶ 40                                    1. *The Law*

¶ 41        The State bears the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. When a defendant challenges his conviction, arguing that the evidence was not sufficient to prove him guilty, a reviewing court must (1) consider all of the evidence in the light most favorable to the State and (2) determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Brown*, 2013 IL 114196, ¶ 48, 1 N.E.3d 888.

¶ 42        "It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Bradford*, 2016 IL 118674, ¶ 12, 50 N.E.3d 1112. "Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 26, 83 N.E.3d 671.

¶ 43        "A reviewing court will not reverse a defendant's conviction simply because there is contradictory evidence or because the defendant claims a witness was not credible." (Internal quotation marks omitted.) *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 56, 126 N.E.3d 703. "Instead, a reviewing court will reverse a defendant's conviction only when the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's

guilt." *Id.*

¶ 44          2. *The State Proved Defendant Guilty of Aggravated Domestic Battery*

¶ 45          First, defendant argues that because Williams recanted, the State did not prove defendant guilty beyond a reasonable doubt. On the night in question, Williams plainly asserted that defendant brutally choked her to the point that she almost lost consciousness and thought her neck may have been broken. Leading up to the trial, and at the trial itself, she explained that she had lied and that any marks on her were caused by consensual sexual activity. She also explained that she lied to get defendant in trouble because she was mad at him about an affair he had.

¶ 46          The jury was entirely capable of weighing these conflicting stories and deciding which version they believed. The jury could have believed Williams's explanation that she had lied. However, it did not. In other words, the jury concluded that Williams was being honest when she said defendant choked her and dishonest when she later said she made it all up.

¶ 47          Defendant describes numerous factors that cut against the credibility of Williams's story to the police that night, such as the fact that Williams and Carmona testified about smacking each other to fabricate injuries. Nonetheless, the jury was able to consider that fact, along with all of the evidence, which we need not repeat. The jury determined which story was more credible, as it was entitled to do. This court will not substitute its judgment for that of the fact finder on this question of credibility. See *McGath*, 2017 IL App (4th) 150608, ¶ 26.

¶ 48          Second, defendant argues that Williams's prior statements were only admitted for impeachment purposes and should not have been considered as substantive evidence. However, the record shows that Williams acknowledged the statements that she made to the police. For example, the State asked her, "And did you tell Deputy Erickson that [defendant] threw you onto the floor and choked you?" Williams replied, "I did." Defendant now claims that if the jury

considered these statements as substantive evidence, this would have been error. Defendant is incorrect.

¶ 49    We recognize that the procedure the State followed in this case deviates from the best practices we described in *People v. Brothers*, 2015 IL App (4th) 130644, ¶¶ 70-75, 39 N.E.3d 1101 (abrogated on other grounds by *People v. Veach*, 2017 IL 120649, ¶ 39, 89 N.E.3d 366); however, the fact remains that Williams acknowledged from the witness stand making her prior inconsistent statement, which means that the jury was entitled to consider them as substantive evidence. See 725 ILCS 5/115-10.1(c)(2)(B) (West 2018). Had Williams denied making the earlier statements, then (as explained in *Brothers*) the state's questions might have constituted reversible error. *Brothers*, 2015 IL App (4th) 130644, ¶ 72. In other words, because the jury properly considered the statements as substantive evidence, defendant's argument fails.

¶ 50        3. *The State Proved Defendant Guilty of Aggravated Assault*

¶ 51    Defendant also claims that the State failed to prove him guilty of aggravated assault beyond a reasonable doubt because (1) Goembel was on the sidewalk about 20 feet away from defendant, (2) defendant remained on the porch, (3) defendant held the knife but did not point it at anyone, (4) defendant did not advance on Goembel, and (5) Goembel did not retreat.

¶ 52    A person commits the offense of aggravated assault when he knowingly engages in conduct which places another in reasonable apprehension of receiving a battery and does so while using a deadly weapon. 720 ILCS 5/12-2(c)(1) (West 2016). In this case, defendant waved around a large, serrated knife and threatened to kill Goembel and others. Goembel said he "absolutely" was afraid that defendant "was going to do something with that knife" because defendant "could run at me [or] do something else to anybody standing around." Defendant even admitted to the police that he invited Goembel to fight by saying defendant would "beat his ass." This was not a

situation in which defendant was merely using "threatening words" with "no evidence of conduct or threatening gestures accompanying" those words as in *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 31, 159 N.E.3d 518. Instead, defendant waved the knife around and slapped it against his leg. Defendant was armed, threatening, and relatively close to Goembel. The jury viewed all of the evidence and determined that defendant's actions and words towards Goembel placed Goembel in reasonable apprehension of receiving a battery. We will not second-guess that decision.

¶ 53                    B. The State Did Not Engage in "Misconduct"

¶ 54        Finally, defendant claims the State engaged in "misconduct" by eliciting testimony that defendant had committed prior acts of domestic violence in violation of the procedures set forth in section 115-7.4 of the Code (725 ILCS 5/115-7.4 (West 2018)). We disagree.

¶ 55        First, we acknowledge that the trial court (1) agreed that the State did not follow proper procedure regarding this evidence and (2) sustained defendant's objection. Recently, this court noted that when improper evidence is introduced at trial, defendant's objection and the trial court's sustaining of that objection is the appropriate remedy. *People v. Williams*, 2020 IL App (4th) 180554, ¶ 69. Specifically, we said, "However, defendant objected to the State's questions ***, and the trial court sustained those objections. Because of this, defendant has already received his remedy." *Id.* Here, defendant objected to the improper questioning, and the trial court sustained that objection. Defendant thus received his remedy.

¶ 56        Second, we again express our disagreement with the recent fashion of defense counsel on appeal deploying a very serious term, "prosecutorial misconduct," with reckless abandon. We recently stated in *Williams* as follows:

                "Defendant describes the State's alleged errors as 'misconduct' on multiple

occasions, and we now wish to delineate misconduct from mere error. Black's Law Dictionary defines 'misconduct' as 'dereliction of duty; unlawful, dishonest, or improper behavior, esp. by someone in a position of authority or trust,' and, 'An attorney's dishonesty or attempt to persuade a court or jury by using deceptive or reprehensible methods.' Black's Law Dictionary (11th ed. 2019). This court considers actions, such as *Brady* violations or *Batson* violations, to be misconduct. Even taken as true, this court would not consider defendant's allegations in this case to constitute prosecutorial misconduct.

By way of explaining why we reject defendant's characterization of the prosecutor's closing argument, we ask the following: When a trial judge makes an erroneous ruling, is that judicial misconduct? Or when defense counsel asks an improper question, is that attorney misconduct? With very rare exceptions, the answer is no. The same thinking should apply to claims that the prosecutor did something erroneous. We encourage defendants to allege prosecutorial misconduct occurred only when the circumstances justify that pejorative description." *Id.* ¶¶ 74-75.

¶ 57 None of the prosecutor's remarks in this case come close to constituting "prosecutorial misconduct."

¶ 58                                III. CONCLUSION

¶ 59 For the reasons stated, we affirm the trial court's judgment.

¶ 60 Affirmed.