NOTICE
Decision filed 07/23/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170247

NO. 5-17-0247

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-1278 |
| | ) | |
| BRADLEY VANHOOSE, | ) | Honorable |
| | ) | Randall W. Kelley, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court, with opinion.
Justices Overstreet and Boie concurred in the judgment and opinion.

**OPINION**

¶ 1 Following a bench trial in the circuit court of St. Clair County, the defendant, Bradley VanHoose, was found guilty of assault and was sentenced to one year of court supervision. The defendant has brought before this court a direct appeal challenging the sufficiency of the evidence upon which the trial court's judgment was made, as well as alleging the trial court failed to properly admonish him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 2984) regarding his right to have counsel represent him during posttrial proceedings.

¶ 2 After review of the record and evidence before the trial court, we find the trial court erred in finding the defendant guilty of the lesser-included offense of assault, where no rational fact finder could have found him guilty of that offense beyond a reasonable doubt. When viewed in the light most favorable to the prosecution, the State only proved that the defendant verbally threatened

1

to harm the victim at some future time. Therefore, the evidence was insufficient to find him guilty of assault.

¶ 3    Additionally, the defendant, in the alternative, alleges that the judgment of the court should be vacated because the trial court failed to inform him of his right to be represented by counsel as required by Illinois Supreme Court Rule 401(a)(3) (eff. July 1, 1984). This issue is rendered moot by our reversal of the trial court's judgment; therefore, we do not address that issue in this opinion and do not recite the facts relevant specifically to that issue.

¶ 4                                    I. BACKGROUND

¶ 5    This case involves three individuals: the defendant, Bradley VanHoose; radio talk show host Robert Romanik; and former Caseyville mayor Leonard Black. Though the altercation at the focus of this case occurred on April 15, 2016, we must first discuss various interactions that occurred between these three individuals prior to that date in order to place the events of April 15, 2016, in context.

¶ 6    On March 21, 2016, Romanik was hosting his radio show live in front of the St. Clair County courthouse. The defendant was present at the live show to protest against Romanik. While protesting, Romanik and the defendant exchanged words. According to testimony from the defendant, while speaking on his radio show, Romanik commented that the defendant better be careful what he says to him because Romanik could be the defendant's father. Romanik then went on to make a comment about whether or not he would have intercourse with the defendant's mother. The defendant responded in kind and made a derogatory comment about Romanik's son.

¶ 7    The following day, Romanik had a discussion on his radio show about how several callers had informed him that one of the protesters at the courthouse was a pedophile. In his testimony at trial, Romanik denied ever specifically referring to the defendant as the pedophile protester.

2

However, the defendant testified that "there was no [*sic*] nobody else [at the live broadcast]" and, thus, he knew Romanik was referring to him.

¶ 8    Romanik, in his testimony, did admit to calling the defendant "Brad VanLoser" on his radio show on multiple occasions, as well as calling him a "no-good son of a b***" and telling him to "get a job." The defendant testified that on April 13, 2016, Romanik stated that he had talked to the defendant's estranged father. According to the defendant, he received a phone call from his father, whom he had not spoken to in nearly two years. In that call, the defendant's father used profanities towards the defendant and said that the defendant was the "pedophile protester."

¶ 9    The defendant testified that he believed Black was responsible for giving Romanik the idea of contacting his father because Black knew the defendant's father and knew that the defendant and his father were not on good terms. Further, Black knew that the defendant especially detested pedophiles and believed Black instructed Romanik to use that particular allegation against him. The Black and VanHoose families were well acquainted because Black's son married the defendant's sister and because the defendant had supported Black during his campaign for mayor. Black and the defendant had a falling out after Black was elected. The defendant became publicly critical of Black's performance in office and his dealings with Romanik, especially his alleged receiving of undisclosed gifts from Romanik.

¶ 10    On April 15, 2016, Black and Romanik agreed to meet at the South Main Diner for coffee around 4 p.m. At that same time, the defendant was at an establishment called Jessie's Hideout, which is located on a lower level below the diner.

¶ 11    The defendant testified he had been riding his motorcycle that day and stopped to make a phone call at Jessie's Hideout. While using his phone out on the patio, he saw Black walking through the parking lot. At that time, he confronted Black, testifying that "I gave him a piece of

3

my mind for [Romanik] calling me a pedophile and my dad calling—you know, bringing my father into the—the discourse." The defendant then testified that after the initial confrontation, he returned to Jesse's Hideout to retrieve his keys. He then mounted and started his motorcycle. While on his motorcycle, he saw Romanik pull into the parking lot. According to the defendant, Romanik was not present during the initial interaction between Black and himself. The defendant further testified, "Romanik got out of his car, and all I saw was the gesticulations, his arms and his mouth going, I really couldn't hear him." The defendant then responded by stating to Romanik, "Do you remember me? I'm the fella you've been calling the pedophile protester on the air. Do you feel like calling me that now?" Then the defendant left on his motorcycle while Romanik "kept cussing *** went in [the diner] and did *** crotch grabbing." The defendant denied ever making any specific threats of violence to Black or making any death threats to anyone.

¶ 12    Black and Romanik offered different accounts of the April 15, 2016, altercation. According to Black, he first saw the defendant once Black entered the South Main Diner parking lot. Black heard the defendant "cussing and carrying on, calling me names, said he's going to get me *** called me a worm and SB's." Black testified he was nervous as to what the defendant might do. Black kept walking up the incline towards the diner entrance, and the defendant followed him "as far as he could go because [of] the retaining wall, and then I kept going, and he's still hollering and screaming at the top of his voice at me." The defendant then went back into Jessie's Hideout. The defendant then returned "flying up the hill" as Black was still walking towards the entrance and "pull[ed] along [Black] on the motorcycle." At that time, the defendant saw Romanik at the top of the hill in his vehicle and started yelling, "I'm going to kill you," "I'm going to kill yous [*sic*] both," and then the defendant left. Black testified that the defendant had not called him names like that or made comments of a personal nature like that prior to this incident. On cross-

4

examination, when asked about Black and the defendant's proximity, Black testified that he and the defendant "were not real close." He went on to clarify that it was a "distance of fifteen feet, maybe, twenty feet." He further acknowledged that when he gave testimony at an order of protection hearing following the incident, he testified the defendant "kept a safe distance" and then further clarified this comment saying that "I was not within close range where something could happen right there."

¶ 13 Romanik testified that he saw and heard the altercation between Black and the defendant. He stated that the defendant "was yelling and screaming and cussing and 'motherf***' this and that." He was able to hear this interaction despite his windows being rolled up and his radio playing in his vehicle. He then got out of his vehicle, and he heard the defendant say, "I'll kill you, Leonard Black." Then the defendant saw Romanik and said, "I'll kill you too, you son of a b***. Don't talk about me on the radio." According to Romanik, the defendant was walking with his motorcycle when the comments were made and then the defendant got on his motorcycle and left.

¶ 14 On September 23, 2016, the defendant was charged by indictment with the offense of threatening a public official, in violation of section 12-9(a)(1)(i) of the Criminal Code of 2012 (720 ILCS 5/12-9(a)(1)(i) (West 2016)), a Class 3 felony. The indictment alleged that on April 15, 2016, the defendant knowingly communicated a threat to Black, a public official, that placed Black in reasonable apprehension of immediate or future bodily harm; that threat being that the defendant would kill Black. It further alleged that the defendant made the threat as a result of Black's position as mayor of Caseyville.

¶ 15 On January 18, 2017, the defendant waived his right to a jury trial. A bench trial was conducted on February 17, 2017, where the three occurrence witnesses testified as described above. The chief of police for Caseyville, Illinois, at that time, Frank Moore, also testified for the

5

State regarding a five-page document that had been e-mailed to him by the defendant that had attached a verified copy of Black's petition for stalking or no contact order. In the initial e-mail, the defendant stated that he "did give Leonard Black a few choice words, but be assured, I never threatened anyone."

¶ 16    Following the presentation of evidence and closing arguments, the trial court reached its ruling, finding that the State had failed to meet its burden of proof as to the charge of threatening a public official. Specifically, the trial court held the State failed to "prove the nexus *** of the alleged threat to Mr. Black and his elected and political position," a required element under the statute. However, the trial court went on to find that it "has the power to assess lesser included offenses that could exist; and therefore, the defendant, based upon the credibility of the testimony setting forth the threats by Mr. VanHoose, finds those threats to be credible, and thus, the defendant is found to be guilty of the offense of assault in violation of statutory [s]ection 720 ILCS 5/12-2 [*sic*] [(West 2016)]. That's a Class C misdemeanor." The trial court then sentenced the defendant, stating, "[t]here has been no apparent history of any ongoing actions by Mr. VanHoose that have been threatening or created any issues regarding Mr. Black; and, therefore, the defendant is hereby sentenced to a period of one-year court supervision." He was also assessed fines and costs in the amount of $250.

¶ 17    Following the trial, on March 15, 2017, the defendant filed a *pro se* motion to reconsider the trial court's judgment. This document was filed *pro se* following a "breakdown in communication" between the defendant and his counsel, who ultimately withdrew his representation. The defendant's motion to reconsider included a number of various claims; however, none of them are relevant to our decision. Thus, for brevity's sake we do not discuss the

6

facts relating to those court proceedings. On June 1, 2017, following a hearing and presentation of evidence regarding the motion to reconsider, the trial court denied the defendant's motion.

¶ 18 On June 30, 2017, the defendant filed a notice of appeal. On February 17, 2018, the defendant successfully completed his court supervision and the charges against him were dismissed.

¶ 19 II. ANALYSIS

¶ 20 As a threshold matter, we first consider an issue not raised in the briefs on appeal but discussed briefly at oral argument. Specifically, we consider whether the trial court's dismissal of the charges following the defendant's completion of supervision renders the defendant's direct appeal moot. We find that this matter is not moot and that this court is able to grant the relief sought by the defendant based upon the following.

¶ 21 While Illinois courts have not specifically addressed this particular mootness issue within the context of an assault conviction, our supreme court has consistently found that where the offense of which the defendant is found guilty may be considered in future proceedings or sentencing as an enhancement or aggravating factor, then there is an interest in being able to challenge that finding of guilt. See, *e.g.*, *People v. Jordan*, 218 Ill. 2d 255 (2006) (finding of guilt for child endangerment); *People v. Sheehan*, 168 Ill. 2d 298 (1995) (finding of guilt of DUI); *People v. Johnson*, 128 Ill. 2d 253 (1989) (order of supervision may be used as evidence in aggravation in sentencing for future conviction). Some decisions from this court "have upheld the adverse consideration of dispositions of supervision in employment decisions." *Jordan*, 218 Ill. 2d at 264 (citing *Beard v. Sprint Spectrum, LP*, 359 Ill. App. 3d 315, 319-20 (2005)); *cf. Sroga v. Personnel Board of the City of Chicago*, 359 Ill. App. 3d 107, 111-14 (2005). Additionally, the Criminal Code of 2012 allows a trial court to consider "prior criminal activity" in sentencing. See

7

730 ILCS 5/5-5-3.2 (West 2016). Moreover, the impact of a finding of guilt, whether it qualifies as a conviction or not, has practical, real world consequences. It can affect one's ability to obtain work and can negatively affect one's reputation in the community, among other things. This is especially true in the Internet age, where a finding of guilt, even if dismissed, may persist online. Finally, we note that in this matter, both the defendant and the State, when questioned on the issue at oral arguments, agreed that the matter was not moot and that our court should proceed with a ruling. As a result of the foregoing, we find this matter not to be moot and continue with our analysis.

¶ 22    We now turn our focus to the defendant's claim that the trial court erred when it determined there was sufficient evidence to find him guilty of the lesser-included offense of assault.

¶ 23    The defendant's only charge prior to his bench trial was threatening a public official in violation of section 12-9(a)(1)(i) of the Criminal Code of 2012. 720 ILCS 5/12-9(a)(1)(i) (West 2016). The trial court did not find sufficient evidence to support a finding of guilt as to that charge and, instead, found the defendant guilty of the uncharged offense of assault. A defendant may be convicted of an uncharged offense "if it is a lesser-included offense of a crime expressly charged in the charging instrument [citation], and the evidence adduced at trial rationally supports a conviction on the lesser-included offense and an acquittal on the greater offense." *People v. Kolton*, 219 Ill. 2d 353, 360 (2006). Both parties concede that assault is a "lesser-included offense" contained within the charge of threatening a public official and that the trial court had the authority to find the defendant guilty of assault, if evidence supported such a finding. The parties differ only as to whether sufficient evidence existed to support the trial court's ruling.

¶ 24    When "reviewing the sufficiency of the evidence to sustain a verdict on appeal, the relevant inquiry is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Cooper*, 194 Ill. 2d 419, 430-31 (2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). "Under this standard, a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses." *Id.* at 431. "This same standard of review applies regardless of whether the evidence is direct or circumstantial [citation], and regardless of whether the defendant receives a bench or jury trial [citation]." *Id.*

¶ 25    The offense of assault occurs when an individual who, "without lawful authority, *** knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a) (West 2016). Whether an assault victim was reasonably apprehensive is a question of fact. See *People v. Enerson*, 202 Ill. App. 3d 748, 749 (1990). A victim's apprehension can be established inferentially based on the conduct of the defendant and the victim. *Id.* at 749-50. "Determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact." *People v. Lattimore*, 2011 IL App (1st) 093238, ¶ 35. "A reviewing court must allow all reasonable inferences from the record in favor of the prosecution and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Taylor*, 2015 IL App (1st) 131290, ¶ 11. Here, the defendant argues the trial court erred in finding that the evidence adduced at trial supported a finding that he placed Black in reasonable apprehension of imminent bodily harm or a battery. The defendant admits that he "gave [Black] a piece of [his] mind," but he denies that he took any action towards Black that would have resulted in him fearing bodily harm and, thus, argues that the evidence presented at the bench trial was insufficient to find him guilty of assault.

9

¶ 26    "[A]ssault whether civil or criminal has involved (1) a threatening gesture, or an otherwise innocent gesture made threatening by the accompanying words, that (2) creates a reasonable apprehension of an imminent battery." (Emphases omitted.) *Kijonka v. Seitzinger*, 363 F.3d 645, 647 (7th Cir. 2004). While this statement was made by a federal circuit court, our courts are in agreement, stating: " 'In Illinois, we have held that words alone are not usually enough to constitute an assault. [Citation.] Some action or condition must accompany those words before there is a violation of the statute.' " *Taylor*, 2015 IL App (1st) 131290, ¶ 15 (quoting *People v. Floyd*, 278 Ill. App. 3d 568, 570-71 (1996)). Moreover, reviewing courts have held that a victim's apprehension must be of an immediate or imminent battery, not of an indeterminate future harm. *People v. Kettler*, 121 Ill. App. 3d 1, 6 (1984).

¶ 27    Illinois courts have laid out various types of conduct, gestures, or conditions that are required before threatening words may be considered to be an assault. Some examples include (1) the defendant having her hand on a gun and stating, " '[t]here is nothing left to do except to shoot you' " (*People v. Preis*, 27 Ill. 2d 315, 317-19 (1963)); (2) the defendant wielding a tire iron while threatening to " 'bust' " the victim's " 'brains out' " (*People v. Alexander*, 39 Ill. App. 3d 443, 445-47 (1976)); (3) the defendant threatening to "blow [the] head off" of an individual while opening a trunk to apparently retrieve what was thought to be a gun but was later determined to have been a piece of cable (*People v. Holverson*, 32 Ill. App. 3d 459, 459-60 (1975)); (4) the defendant approached the victim, expressed anger towards the victim, and then struck the victim's bicycle while the victim was still straddling the bicycle (*In re Gino W.*, 354 Ill. App. 3d 775, 778 (2005)); (5) the defendant cursed and yelled "within three inches of [the victim's] face," then got in his vehicle and drove it into victim, got out of his vehicle, and then came within "striking distance [and] told [the victim] that he was going to 'kick his a***' " (*People v. Ferguson*, 181 Ill.

App. 3d 950, 951 (1989)); and (6) the defendant drove his car within a few feet of the victim, who was confined to a wheelchair, shouted at her, exited his vehicle, and then came within a foot of her and threatened to " 'beat her head in' " (*People v. Rynberk*, 92 Ill. App. 3d 112, 114-16 (1980)).

¶ 28    The defendant points to these cases as support for his argument and emphasizes that the conduct and actions that occurred in these cases is not present in the facts here. While the defendant draws a distinction with the present set of facts using the cases above, the defendant puts forth *Taylor*, 2015 IL App (1st) 131290, as an analogous case to the present matter.

¶ 29    In *Taylor*, the defendant shouted obscenities at a deputy and was asked to leave the courthouse. *Id.* ¶ 13. The defendant was then escorted out of the courthouse as he continued to yell obscenities at the deputy. *Id.* Once the defendant was standing in the airlock doors to the building, the defendant yelled at the deputy who, was on the other side of the doors and approximately 7 to 10 feet away, that she was going to " 'get [her]' " and " 'kick [her] a***.' " *Id.* The deputy testified in court that she felt as if she was " 'going to receive a battery.' " *Id.*

¶ 30    The *Taylor* court overturned the assault conviction based upon the fact that there was no evidence that the defendant was armed with any weapon, the defendant was 7 to 10 feet away from the deputy behind airlock doors when the threat was made, and there was no evidence that the defendant made any physical gesture towards the deputy, "only the mere words of a verbal threat." *Id.* ¶ 17.

¶ 31    Additionally, the defendant argues that there is the requirement that the threat of harm be *imminent*. "[A] threat of future violence is obviously insufficient for an assault, because it is neither an attempt to commit a battery nor an act placing the other in apprehension of receiving an *immediate* battery." (Emphasis in original and internal quotation marks omitted.) *Kettler*, 121 Ill. App. 3d at 6. The *Kettler* court went on to note that the offense of assault "does not reach the

11

apprehension of a battery as a result of some threat of harm at an unspecified future date." *Id.* Following the law as set forth in *Taylor* and *Kettler*, the defendant argues that no rational fact finder could have determined that the elements of assault were fulfilled because there was no evidence of conduct or threatening gestures accompanying the threatening words that would have placed a reasonable person in apprehension of *imminent* harm or injury. We agree.

¶ 32    We find the evidence to be insufficient to find the defendant guilty of assault, first and foremost, because neither Black nor Romanik testified to the defendant making any physical movement or gestures towards Black of a threatening nature. The only action that could be considered to fall within the realm of a threatening movement was Black's testimony of the defendant's "flying up the hill" on his motorcycle. We note that Romanik testified differently, stating that the defendant was "walking" his motorcycle up the hill when he was making the threats and then got on his motorcycle after the threats were made. In any event, taking Black's testimony as true, Black never testified or implied that the motorcycle was driven at him or that it ever got close to his person. In fact, Black testified to the opposite. When asked about the distance between the defendant and him, Black responded by saying, "we were not real close," the defendant was "a distance of fifteen feet, maybe, twenty feet." This is a distance that Black, himself, described as being a "safe distance" at an earlier order of protection hearing. We acknowledge that Black did testify that he was subjectively afraid; however, he contradicted this testimony later in the trial by stating the defendant was "not within close range *where something could happen right there*." (Emphasis added.) We further acknowledge that Black's testimony on the issue of apprehension is not strictly determinative because the applicable standard is an objective standard using a reasonable person's perception. However, given the testimony that the defendant was 15 to 20 feet away, the defendant was either holding his motorcycle or straddling it while making the threats,

12

which would have restricted any immediate movement by the defendant, there was a retaining wall during the earlier encounter that prevented the defendant from following Black, and there is no evidence that the defendant had a weapon or threatened that he had a weapon, we find that the evidence is insufficient to support a finding of guilt for assault beyond a reasonable doubt.

¶ 33    The State argues that the line of cases discussed above do not simply demonstrate various forms of "threatening gestures" that qualify for assault but instead stand for the broader proposition "that what constitutes a 'threatening gesture' is to be considered in the context of the facts presented." The State then contends that the defendant's threats and actions were escalating during the encounter. Specifically, the defendant initially followed Black, while yelling at him, which resulted in Black attempting to evade the defendant until a retaining wall thwarted the defendant's advances. Then, following that initial encounter, the defendant retrieved his keys, got on his motorcycle, and rejoined Black near the entrance of the building in an erratic manner by "flying up the hill" on his motorcycle. Finally, after the defendant pulled up alongside Black, he then threatened to kill him. Viewing these events within the context of the "longstanding and explosive anger defendant harbored against Black and his compatriot Romanik," the State argues that "a trier of fact may conclude that a reasonable person in Black's position could apprehend receiving a battery." While we acknowledge that each case of assault must be viewed within the context of the facts of that case and the history of the individuals involved, we disagree with the State's ultimate conclusion in this case.

¶ 34    The State is correct that if a victim has prior knowledge of violent propensities of the aggressor, there are occasions where conduct, which by itself would not normally allow a finding of reasonable apprehension of danger, may be inferred to cause such response due to the

13

complainant's prior knowledge of the aggressor. See, *e.g.*, *In re C.L.*, 180 Ill. App. 3d 173 (1989). However, we disagree that such sufficient prior knowledge of violent propensities is present here.

¶ 35 While there was evidence presented of a strong dislike between the parties, that alone is not sufficient to overcome Illinois's longstanding case law that words alone are insufficient for a finding of assault. Here, there was no evidence presented that the defendant had a criminal history involving violence or that he was known as a violent person. In fact, Black testified that the defendant had never called him those names before nor had he ever directed offensive comments of a personal nature towards him during any of the confrontations they had during their village board meetings. Additionally, it was stipulated by the State that there were "two city council members in the back of the courtroom that [were] willing to testify that [the defendant] has never been a problem at the city council meetings and his input is welcome there." Thus, given the defendant and Black's long history, where confrontation had occurred before, but they never had any physical altercations, we do not find it reasonable that Black's knowledge of the defendant alone would be sufficient to warrant an increased apprehension of danger under these circumstances.

¶ 36                                         III. CONCLUSION

¶ 37 Therefore, taking the evidence in the light most favorable to the prosecution and accepting to be true the accounts of the witnesses Black and Romanik, we find that there was insufficient evidence for the trial court to find the defendant guilty of assault. There was no evidence of conduct or threatening gestures accompanying the threatening words expressed by the defendant that would place a reasonable person in fear of imminent harm or battery given the distance and obstacles between the defendant and Black.

¶ 38 For the foregoing reasons, we reverse the defendant's conviction of assault.

14

¶ 39    Reversed.

2020 IL App (5th) 170247

NO. 5-17-0247

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 16-CF-1278 |
| | ) | |
| BRADLEY VANHOOSE, | ) | Honorable |
| | ) | Randall W. Kelley, |
| Defendant-Appellant. | ) | Judge, presiding. |

---

**Opinion Filed:**      July 23, 2020

---

**Justices:**      Honorable James R. Moore, J.

Honorable David K. Overstreet, J., and
Honorable Mark M. Boie, J.,
Concur

---

**Attorneys for Appellant**      James E. Chadd, State Appellate Defender, Ellen J. Curry, Deputy Defender, Richard J. Whitney, Assistant Appellate Defender, Office of the State Appellate Defender, Fifth Judicial District, 909 Water Tower Circle, Mt. Vernon, IL 62864

---

**Attorneys for Appellee**      Patrick Delfino, Director, Patrick D. Daly, Deputy Director, as Special Prosecutors, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864