# Illinois Official Reports

## Appellate Court

> ### *People v. Powell*, 2021 IL App (1st) 181745

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES POWELL, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-18-1745 |
| Filed | August 9, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-CR-8699; the Hon. Dennis J. Porter, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | DePaul University Legal Clinic, of Chicago (Maria A. Harrigan, of counsel, and Alexandra Frisbie and Scout Distefano, law students), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Mari R. Hatzenbuehler, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Walker concurred in the judgment and opinion.<br>Justice Pierce dissented, with opinion. |

¶ 1      A jury convicted James Powell of delivering a controlled substance (less than one gram of a substance containing heroin), and the trial court sentenced him to nine years' imprisonment. On appeal, Powell argues the State failed to prove his guilt beyond a reasonable doubt where (i) the police officer's identification testimony of Powell was unreliable, (ii) the police did not find prerecorded funds used to purchase the heroin on Powell after the transaction, and (iii) the surveillance video did not corroborate the officer's testimony. Powell also argues that prosecutorial misconduct during closing arguments denied his right to a fair trial.

¶ 2      We agree with the State that any one of the alleged deficiencies in the evidence, considered alone, would be an inadequate ground on which to find the officer's testimony insufficient. Taken together, however, they leave reasonable doubt as to Powell's guilt, and his conviction cannot stand. And so we reverse.

¶ 3                                       Background

¶ 4      Powell was charged with one count of delivery of a controlled substance (heroin) (720 ILCS 570/401(d)(i) (West 2016)), stemming from an undercover narcotics operation known as a controlled narcotics purchase.

¶ 5      Chicago police officer Larry Rattler, an undercover officer with the narcotics division, worked with nine other officers on an assignment in a "high narcotics area." Rattler made the narcotics purchase. As part of his duties, he wore "regular civilian clothes." Rattler and Officer Tito Fernandez arrived in an unmarked car. Rattler got out on 16th Street and walked westbound. Other officers recorded his movements with a video camera.

¶ 6      Rattler saw "several people standing out" on his way to the liquor store, located in the middle of the block. Before entering the store, Rattler asked a man wearing a brown vest "where the blows at." The man pointed toward a nearby restaurant, "Goldy Fish and Chicken." Rattler explained "blows is a street term for heroin." Rattler purchased beer as part of his role as an undercover officer and then went to the restaurant.

¶ 7      Rattler sat on a ledge to the right of the entrance. Also inside were two or three individuals, one of whom Rattler identified in court as Powell. According to Rattler, Powell stood "in the window" and had on "a black jacket, red hoodie, blue jeans," with the hoodie "up." Rattler approached Powell, and Powell asked, "How many?" Rattler said, "Two." Before approaching Powell, a man with a dark hat and red jacket tried "to sell [Rattler] some like shades or something like that." Rattler declined.

¶ 8      When asked why he approached Powell, Rattler said, "Just a[n] instinct. I had been doing it a long time." Rattler knew the gesture to purchase narcotics and thought Powell was selling because they exchanged "a look." Rattler handed Powell $20 in prerecorded funds. Powell gave him two plastic ziplock bags with an orange logo. Rattler asked Powell for his phone number; Powell responded he "will be around here." Rattler walked back to his car and believed that Powell left the restaurant.

¶ 9      When Rattler returned to his car, he told Fernandez and his team by radio about a "positive transaction." Rattler described Powell's clothing. As Powell walked towards their car, Rattler and Fernandez "left the area," so Powell would not get too close to them. About five minutes

later, Rattler heard over the radio "that they had the subject detained." From inside the car and half a block away, Rattler pointed out Powell to the officers.

¶ 10 Rattler inventoried the narcotics and sent them to the crime lab for analysis and testing. Rattler identified the bags he inventoried and photographs of the scene, including photographs of Powell. Rattler also identified a video of the undercover narcotics purchase, which he stated "fairly and accurately depict[ed] the events." The State published the video. Rattler identified himself in the video and said he had no prior interaction with Powell and had engaged in "[h]undreds" of undercover narcotics purchases.

¶ 11 The surveillance video depicts the view of an intersection from inside a car. A man wearing a baseball cap, whom Officer Rattler identified as himself, crosses the street in front of a corner restaurant and approaches a man wearing a tan vest standing in front of the neighboring storefront. They speak. The man gestures with a tip of his head toward the direction from which Rattler came. Rattler enters a liquor store for a short time and leaves with a container of beer. A man wearing a black jacket over a red hoodie with the hood up, whom Rattler identified as Powell, walks into the restaurant. Rattler enters the restaurant and sits to the side, the view partially obscured by a sign in the window. A man, holding a white object and wearing a red hoodie, approaches Rattler and shows him an object. Rattler stands up and walks to an area obscured by the doorway and remains a few seconds before leaving. Seconds later, Powell leaves the restaurant, looking in the direction Rattler had been walking, and goes in the opposite direction, toward the neighboring storefront. Next, Powell walks back toward the restaurant and crosses the street.

¶ 12 Powell periodically appears out of frame, which does not focus entirely on Powell or Rattler or track all of Powell's movements, including his destination immediately after leaving the restaurant.

¶ 13 On cross-examination, Rattler identified photographs of screenshots from the published video. He checked out the $20 bill used during the drug buy. He confirmed the purpose of making a buy with the prerecorded funds was "to trace the money" but also stated "[s]ometimes we don't check because it's an ongoing investigation." Rattler explained that if he bought drugs with the funds and then arrested someone five minutes after the transaction, he would check to see if the person had the funds. Rattler "took a look" at the two bags of heroin and estimated they contained about 0.4 grams, with a street value of $60. He confirmed he did not arrest anybody but saw police detaining Powell near the restaurant. Rattler believed the officers arrested the correct man, and his report indicated "[i]t was a positive identification." The report did not indicate Rattler saw officers detain Powell.

¶ 14 On redirect examination, Rattler said that prerecorded funds sometimes go unrecovered when the suspect is not arrested at the time. He saw Powell inside the restaurant and "got a look at his face" when he walked up to him and made the purchase.

¶ 15 Chicago police officer Fernandez testified he served as the surveillance officer ensuring Rattler's safety. Fernandez identified Powell as whom he saw from inside the car at 75 to 100 feet away. He did not require visual aids. Fernandez watched Rattler walk westbound on 16th Street toward Lawndale Avenue, where he walked to the front of a liquor store. Before entering, Rattler spoke with a man wearing a brown vest. Rattler went inside "for approximately about up to a minute" and then walked east to the corner and spoke with the man again. After standing on the corner for a few minutes, Rattler entered the restaurant. Fernandez could only see Rattler's "shadow" through the windows, which were dirty.

¶ 16      Fernandez said he tried to "keep eyes on everybody that was either around the store [or] in the store coming out." Powell left the restaurant "a couple seconds" after Rattler and "kept looking at [Rattler's] direction." Fernandez watched Powell walk to the liquor store, after which Rattler returned and pointed out Powell. Powell left the liquor store and walked back toward the corner as Fernandez and Rattler drove in the opposite direction. They returned minutes later after enforcement officers had detained Powell.

¶ 17      On cross-examination, Fernandez said he did not make a video or have a camera. Officer Plonavich took the surveillance video. Fernandez acknowledged Rattler wore no listening device, and he did not see Rattler hand anything to Powell or accept anything from Powell.

¶ 18      On redirect examination, Fernandez explained Rattler's safety and security were his primary duty, and he focused on Rattler rather than Powell until Rattler confirmed Powell as the individual who sold the narcotics.

¶ 19      Chicago police officer Bjornn Millan, an enforcement officer, testified his duties consisted of detaining, identifying, and placing targets into custody. He received a radio communication from Rattler describing the individual who sold him narcotics: "a black jacket, red hoodie, underneath blue jeans." Millan saw someone he identified in court as Powell in front of the restaurant. Millan and his partner detained Powell. Rattler confirmed that Powell as the person who sold him narcotics, and Millan placed Powell in custody.

¶ 20      Millan performed a custodial search for "officer safety" and determined if Powell possessed the prerecorded funds. Millan recovered "a cell phone, wallet, and $77" but no prerecorded funds. About three to four minutes elapsed from the initial communication from Rattler on the positive buy and Powell's arrest.

¶ 21      On cross-examination, Millan said he parked close by the location but could not see the undercover work. Detaining Powell took 30 to 45 seconds. Millan stopped only Powell. On recross examination, Millan acknowledged that Powell had no drugs on him.

¶ 22      The parties stipulated that a chemist with the Illinois State Police would testify she analyzed the contents of the two bags as heroin, weighing a total of 0.9 grams. The State rested.

¶ 23      Powell testified that he arrived at "Goldy Fish and Chicken" during "daylight" to buy food. He ate there three or four times a week and lived in the neighborhood. He did not see Rattler when he entered. The staff told him to wait 5 to 10 minutes for his order. Powell walked to the nearby liquor store to buy a pint of tequila. He did not purchase the tequila because the store only had "fifths." On his way back to the restaurant, "police jumped out" and "grabbed [him] and another guy" whom Powell knew as "Peanut." Powell said Peanut had on a beige jacket in the video. The police officers spoke with Powell and Peanut, searched Powell's pockets, handcuffed him, and placed him in a car. Powell denied selling heroin or speaking with Rattler.

¶ 24      Powell narrated certain portions of the video evidence. He identified Peanut wearing "a beige puffy coat." He said he wore a red hoodie and black jacket and entered the restaurant for the first time that day. Powell identified Rattler walking through the door. Powell indicated that the video did not show him standing anywhere near Rattler.

¶ 25      On cross-examination, Powell said he grew up in the neighborhood and lived there at the time of the incident. He gave the police his girlfriend's address when processed.

¶ 26      On redirect, Powell said he was living with a girlfriend on the day of his arrest, although his state identification card listed an address on West Division Street, a shelter at which he had

never stayed. In rebuttal, the State introduced into evidence Powell's certified convictions for two cases of possession of a controlled substance in 2016.

¶ 27 Before closings, the court informed the jury that "[w]hat the lawyers say during the arguments is not evidence and should not be considered as evidence by you." Further, the court told the jury "[a]ny argument that's made by an attorney that is not based on the evidence or a reasonable inference to be drawn from the evidence should be disregarded by you."

¶ 28 In closing, the State labeled Powell a "drug dealer" who sold "poison to the community." The State argued Rattler was looking for heroin and directed to Powell, "the neighborhood drug dealer, salesman." Powell objected, and the court sustained the objection as to "the neighborhood." The following exchange occurred toward the end of the State's argument:

> "[THE STATE]: Jurors are the conscience of the community. Help the community.
> [DEFENSE COUNSEL]: Objection.
> THE COURT: Overruled. She may continue.
> [THE STATE]: Help rid the community of drugs and drug dealers.
> [DEFENSE COUNSEL]: Objection.
> THE COURT: Overruled."

¶ 29 In defense, counsel argued that Powell did not sell the drugs to Rattler, and "every single piece of evidence" contradicted what the police officer testified. Counsel argued the video did not show Powell selling drugs to anyone and reinforced Powell's testimony rather than Rattler's version of events. Counsel noted police recovered neither the prerecorded funds nor heroin from Powell's person and that another man had on a red jacket with something in his right hand extending toward Rattler. Counsel questioned the cost of the drugs, noting it was "way too cheap," when 0.9 grams of heroin had a street value of $120-$130, and Rattler paid $20.

¶ 30 In rebuttal, the State argued Powell's testimony was not credible because he gave "the parole board" the address on his state identification card, an address where he did not live. Powell objected, and the court sustained the objection. The State continued, arguing "[i]t was the address that he was released on parole that he never lived at," to which Powell again objected, and the court sustained the objection, instructing the jury to disregard the statement. The State also played the video again and argued that once Powell saw where Rattler went, he goes to the store, and "does what anybody would do," and exchange the money "to get rid of [it]" along with any other drugs "if he had any other heroin on him." Powell objected, and the court overruled the objection.

¶ 31 After deliberations, the jury found Powell guilty of delivery of a controlled substance. Powell filed a motion for a new trial and amended motion for a new trial, arguing, in part, that the State made improper remarks during closing arguments. The court denied the motion. The trial court sentenced Powell to nine years' imprisonment.

¶ 32                                Analysis

¶ 33 Powell contends the State failed to prove beyond a reasonable doubt that he was the individual who sold Rattler the narcotics. After his arrest, not only were no prerecorded funds or additional narcotics found on him, but also the surveillance video disputed Rattler's testimony.

¶ 34 When considering challenges to the sufficiency of the evidence, we determine "whether, viewing the evidence in the light most favorable to the State, ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We give a jury's findings great weight (*People v. Wheeler*, 226 Ill. 2d 92, 115 (2007)), but reasonable fact finders can act unreasonably, and we are not bound by a jury's acceptance of witness testimony (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)). Instead, we "carefully examine the record evidence" and reverse where a finding of guilt is unreasonable. See *id.* at 279-80 (reciting standard).

¶ 35 To sustain Powell's conviction, the State had to prove beyond a reasonable doubt that he knowingly delivered a controlled substance. 720 ILCS 570/401(d) (West 2016); *People v. Brown*, 388 Ill. App. 3d 104, 108 (2009).

¶ 36 In this court, Powell agrees that Rattler received a controlled substance containing heroin, but the seller was not him. Powell contends the officers' testimony, coupled with the surveillance video and lack of physical evidence, establishes enough doubt to overturn his conviction. Powell maintains his testimony was more credible, especially given the video evidence. We decline Powell's invitation to reweigh his testimony against Rattler's and will assume the jury properly rejected his version. That said, the deficiencies in Rattler's testimony, taken together, lead us to agree with Powell. His conviction must be reversed.

¶ 37 We start with Rattler's identification of Powell. In Illinois, we consider six factors in determining the reliability of an identification. Five of them are known as the *Biggers* factors: (i) the witness's opportunity to view the offender, (ii) the witness's degree of attention, (iii) the accuracy of the witness's previous description, (iv) the witness's level of certainty, and (v) the length of time between the offense and the witness's identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (citing *Neil v. Biggers*, 409 U.S. 188 (1972)). We also consider a sixth factor, the witness's familiarity with the offender. *People v. McTush*, 81 Ill. 2d 513, 521 (1980).

¶ 38 The first two factors—opportunity to observe and degree of attention—are intertwined here. We must determine "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40. Based on the surveillance video, Rattler and Powell were in the restaurant at the same time for under a minute, and during at least 30 seconds, Rattler interacts with another man. When he is seen with the man he identifies as Powell, the entire transaction lasts four seconds. Viewing the evidence in a light most favorable to the State, Rattler had at most 10 distraction-free seconds to observe the man from whom he purchased drugs. True, the Illinois Supreme Court has upheld convictions where a witness only had "several seconds" to identify an offender but did so where the identification "was corroborated by *compelling* circumstantial evidence." (Emphasis added.) *People v. Herrett*, 137 Ill. 2d 195, 204-06 (1990). As we will discuss, Rattler's perfunctory interaction with the seller undercuts his identification, given the lack of corroborating evidence.

¶ 39 We also find Rattler's description of Powell weighs against finding the identification reliable. Rattler described no physical features. He identifies Powell by his "red hoodie, black jacket, [and] blue jeans," nothing else. When proof beyond a reasonable doubt is at stake, "a conviction should not be sustained on the basis of reference to clothing alone." *People v. Brown*, 131 Ill. App. 2d 717, 720 (1970). And nothing in the record indicates Rattler was acquainted with Powell. Given four seconds to make an identification of a stranger, coupled

with the lack of other physical characteristics about the seller, Rattler's description cuts against reliability. *Cf. id.* (in addition to clothing description, offender "was known" to officer, and officer had "an opportunity to observe the defendant").

¶ 40　　Rattler did not testify to his degree of certainty in the identification, so that factor is neutral. We also find that the time between the offense and Rattler's identification should be weighed neutrally. Though Rattler identified the seller within five minutes of the transaction (see *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 97 (approving time gap of up to two weeks)), again, he identified Powell based exclusively on clothing from at least half-a-block away. On balance, Rattler's identification, based on *Biggers* alone, is shaky at best. It falls apart when considering the other problems with his testimony.

¶ 41　　We already have explained the short duration of Rattler's interaction with the seller. Not only does the quickness of the interaction cut against reliability, it undercuts Rattler's credibility. Just four seconds elapse from the time Rattler moves out of frame to his leaving the restaurant. In four seconds, according to Rattler, he walked up to Powell, waited for Powell to ask "how many," asked for two, received the narcotics, gave Powell marked funds, requested Powell's phone number, waited for Powell to decline and say he would be around the area, and walked out. Taking the evidence in the light most favorable to the State and assuming everyone was speaking and moving quickly, Rattler's testimony strains our deference to the breaking point.

¶ 42　　There's the mismatch between Rattler's testimony about the street value of the heroin (about $60 for 0.4 grams) and the amount Rattler paid, $20. If 0.4 grams costs $60, then the actual value of the 0.9 grams that Rattler purchased had a street value of $135. Even though Rattler said he only "estimated" the street value, we find it incredible that Powell sold heroin to a stranger for an amount of money about seven times less than the estimate of a highly experienced undercover narcotics officer. Though there may be reasons a person selling drugs might sell them at a price lower than their estimated worth (*cf. People v. Beech*, 202 Ill. App. 3d 576, 579 (1990) (describing fluctuation in value of cocaine based on relative purity)), Rattler never explains the gulf between the alleged purchase price and the street value.

¶ 43　　Also, that the prerecorded bill was not found makes a perceptible difference on these facts. We accept the possibility a person could dispose of the money before arrest. See *People v. Newton*, 2018 IL 122958, ¶ 27 (" 'The inference to be drawn [from the evidence] need not be the only conclusion logically to be drawn; it suffices that the suggested inference may reasonably be drawn therefrom.' " (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 401.1, at 147 (9th ed. 2009))). In another case, that may be a reasonable inference. Here, however, that inference does not follow. Powell testified that he went to the liquor store down the street from the restaurant after the alleged drug buy and denied buying alcohol. No testimony even suggests Powell (i) knew Rattler to be an undercover officer, (ii) knew he received a marked $20 bill, (iii) purchased anything at the liquor store, and (iv) had anything on his person reflecting his having disposed of the marked bill. On these particular facts, the lack of prerecorded funds constitutes a saliant piece of evidence.

¶ 44　　Though not bearing on our final analysis, we express concern about an additional aspect of Rattler's testimony—his description of his team's mission as an "investigation." This was not an investigation, as that term is commonly used, even by law enforcement. There were no complaints or reports of criminal activity. The officers went to this area because it was a "high

narcotics area." Rattler did not know who to talk to about purchasing narcotics and asked a stranger. The so-called investigation had no specific target. No concerted attention to detail, which, at a minimum, one would expect in a police investigation. The dissent's musings about our response to the State's hypothetical attempt to elaborate on the meaning of "high narcotics area" is misguided as a matter of law. Police officers routinely testify in ways that might ordinarily violate the rules of evidence to explain their otherwise unexplainable presence in a particular location. *E.g.*, *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107 ("A police officer may testify as to the steps taken in an investigation of a crime 'where such testimony is necessary and important to fully explain the State's case to the trier of fact.' " (quoting *People v. Simms*, 143 Ill. 2d 154, 174 (1991))).

¶ 45        But we digress. Everything considered, Rattler did no more than stumble into a successful buy based on pretense. He then failed to reliably identify the seller resulting in years of incarceration for Powell. The dissent, emphasizing our concession that Rattler obtained drugs, seems to think we have somehow ensnared ourselves in a trap of our own making. But the question of whether Rattler received narcotics from somebody, and whether he identified that somebody beyond a reasonable doubt, presents an altogether different challenge.

¶ 46        In support of its merits argument, the dissent raises the classic counter that we have substituted our judgment for that of the jury and ignore the jury's role as the finder of fact and assessor of credibility. So, we raise the classic retort—for its part, the dissent ignores the well-established role of this court to "carefully examine the evidence" and our duty to reverse a conviction if "*we* are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt." (Emphasis added.) *E.g.*, *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Indeed, even though a jury's credibility finding deserves great weight, it "is not conclusive." *Id.* at 542. The dissent considers our reliance on this aspect of our standard of review as no more than a power grab, accusing us of aggrandizing our own "analytical skill" over that of the jury. *Infra* ¶ 57. But our supreme court's instruction to "carefully examine the evidence" always exists in tension with the deference we owe the fact finder—that we resolve that tension differently than the dissent has been cavalierly misconstrued by the dissent as disparaging the role of the jury.

¶ 47        Because the dissent erroneously believes we may not evaluate the totality of the record, including witness credibility, it similarly errs in accusing us of analyzing irrelevant evidence. We acknowledge that the State does not have to present the prerecorded funds and the buy officer does not have to speculate about the street value of the drugs he or she purchased. When the State chooses to present this information, however, we are not obligated to ignore errors or omissions that have a negative bearing on a witness's credibility. For example, Rattler's testimony, not our "unexplained expertise," undermines his testimony about the amount he paid for the heroin. All we did was simple arithmetic.

¶ 48        The dissent certainly can disagree with us about the sufficiency of the State's evidence against Powell. But its handwringing about our alleged mismanagement of the standard of review is a smokescreen. We owe the jury's judgment deference, not unwavering fealty. *E.g.*, *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000) (appellate court does not act as "mindless rubber stamp" on fact finder's verdict). Moreover, though the dissent implies that we should assign the verdict special solicitude because it came from a jury, the standard is the same in trials by jury or judge. *E.g.*, *People v. VanHoose*, 2020 IL App (5th) 170247, ¶ 24

- 8 -

(" 'Th[e] same standard of review applies *** regardless of whether the defendant receives a bench or jury trial.' " (quoting *People v. Cooper*, 194 Ill. 2d 419, 431 (2000))).

¶ 49 And here, the evidentiary deficiencies lead us to reverse Powell's conviction. Our conclusion turns on the confluence of evidentiary deficiencies. Rattler's identification was not reliable, and together with the other flaws to his credibility, it cannot stand. Assuming Rattler had the requisite knowledge to sustain a conviction, the State controls the questions it asks its witnesses and knows the legal elements it must prove to secure a constitutional conviction, and the State bore the burden to draw that knowledge out. It failed to do so.

¶ 50 We reemphasize, in isolation, any one deficiency in Rattler's testimony would not have been enough to reverse. But, taking the totality of the evidence in a light most favorable to the State, the evidence lacks the probative force necessary for the trier of fact to conclude beyond a reasonable doubt that Powell committed delivery of a controlled substance.

¶ 51 Reversed.

¶ 52 JUSTICE PIERCE, dissenting:

¶ 53 Defendant identifies his primary appellate issue as "[W]hether the State failed to prove beyond a reasonable doubt that [defendant] was the individual who sold the drugs, where neither the pre-recorded funds nor additional drugs were found on him after his arrest, and the surveillance video did not corroborate [the officer's] testimony about the buy." Established caselaw provides the answer: it is not necessary to recover prerecorded funds, additional drugs need not be found on the defendant, and a corroborating surveillance video is not required to sustain a conviction for delivery of a controlled substance. Rather than address the issue raised by the defendant, the majority creates its own theory on appeal and conjures evidentiary deficiencies, mainly Officer Rattler's "unreliable" identification of defendant and his lack of credibility, to reverse Powell's conviction.

¶ 54 The majority attempts to make a significant point when it states that it would not engage in a credibility assessment by reweighing Officer Rattler's testimony against defendant's testimony. And true to its word, the majority does not. Rather, the majority leaves defendant's testimony untouched and picks apart the uncontradicted evidence from the officer involved and his supporting fellow officers, reassessing Officer Rattler's identification testimony and making its own credibility determination, to justify an otherwise unsupported decision to reverse. I respectfully disagree with the majority's decision to reverse this conviction where Officer Rattler's corroborated identification of defendant and his credibility as a witness were sufficiently reliable to convict defendant of knowingly delivering heroin beyond a reasonable doubt.

¶ 55 This was a jury trial. When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational jury could have found the essential elements of the crime beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). This standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. *People v. Tenney*, 205 Ill. 2d 411, 427 (2002). "Under this standard of review, it is the responsibility of the trier of fact to 'fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *People v. Howery*, 178 Ill. 2d 1, 38 (1997) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Importantly, it is not the

function of the reviewing court to retry the defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). A court of review will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). It is "*exclusively within the province of the jury*" to make credibility determinations and decisions on the weight to be given the testimony. (Emphasis added.) *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985).

¶ 56    The majority has undoubtedly substituted its judgment for that that of the jury. It first takes issue with Officer Rattler's identification of defendant, despite the jury's clear acceptance of the evidence supporting the identification. Assessing Officer Rattler's identification of defendant using the *Biggers* factors, the majority finds that Officer Rattler's identification of defendant "is shaky at best." *Supra* ¶ 40. In reaching this conclusion, the majority clearly ignores the mandate that the reliability of a witness's identification is a question for the jury, and it is the function of the jury, as the trier of fact, to resolve inconsistencies in the evidence, assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn therefrom. See *People v. Cox*, 377 Ill. App. 3d 690, 697 (2007). The majority did not hear the testimony. It did not observe the witnesses. It has no authority to weigh the evidence. There is no basis for the majority to substitute its judgment for that of the jury.

¶ 57    The jury found Officer Rattler's identification of defendant was convincing. Defendant is captured on video. He identified himself in the video. He is wearing the clothing described by Officer Rattler. He is seen entering the restaurant. He is later seen leaving the restaurant, with what appears to be money in his right hand. Although his movements in the restaurant are not clearly visible in the video, there is no doubt that defendant remains inside the restaurant for the duration of the time that Officer Rattler is inside. Officer Rattler spent about a minute in the restaurant with defendant. During that time, Officer Rattler testified that he was face-to-face with defendant, he got a good look at defendant's face, and he got close enough to speak with him. Within minutes of the purchase, Officer Rattler described and identified the offender to his partner, Officer Fernandez, who broadcasted defendant's clothing description to the other surveillance officers. Defendant was immediately detained, and Officer Rattler made an on-scene identification of defendant after defendant's arrest, all within five minutes of the purchase. The fact the defendant was wearing the clothes described by Officer Rattler as those worn by the dealer, along with Officer Rattler's in court identification of defendant as the drug dealer, are relevant evidence in the jury's favorable determination of Officer Rattler's and the other testifying officers' credibility. The majority's unsupported, self-imposed view of its superior analytical skill in evaluating witness credibility is nothing more than rationalization.

¶ 58    Officer Fernandez testified Rattler entered their car and pointed to defendant as the person who sold him the drugs. The surveillance video corroborates Officers Rattler, Fernandez, and Millan's testimony that only defendant was wearing clothing matching the description Officer Rattler broadcasted. About two minutes after he left the area, Officer Millan and other officers arrested defendant who was wearing the clothes described by Officer Rattler and then notified Officer Rattler of defendant's arrest. He returned, driving "close enough" to defendant to have an unobstructed view, and identified defendant as the offender. Officer Fernandez testified defendant was the person who left the restaurant shortly after Office Rattler and that he matched the description given by Officer Rattler. Officers Fernandez, Rattler, and Millan identified defendant in court as the person described by Rattler as the person who sold the drugs and who was immediately arrested. Officer Rattler also identified a photo of defendant

wearing the red hoodie, black jacket, and jeans, and he further testified it appeared defendant was holding money in the photo. Defendant agreed that he is the person depicted in the photograph and on appeal concedes that "he was arrested, three to four minutes after the alleged exchange."

¶ 59    The majority also questions Officer Rattler's credibility, finding that it suffers from more credibility hits that, taken together, "strain[ ] our deference to the breaking point." *Supra* ¶ 41. The majority has no right to make a credibility finding. It has no basis for this conclusion where there is absolutely nothing in the record that remotely suggests uncertainty on the part of any of the officers, especially Officer Rattler. It is the jury's function to make credibility determinations. The majority points to the mismatch between Officer Rattler's testimony about the street value of the heroin (about $60 for 0.4 grams) and the amount Officer Rattler paid, $20, as evidence of Officer Rattler's less than truthful testimony. The majority attempts to significantly diminish Officer Rattler's credibility by stating that it is unlikely that a drug dealer would sell heroin to a stranger for less than street value. The value of the heroin is irrelevant. The police officer's opinion of value is irrelevant. The majority's unexplained expertise in determining the street value of heroin is irrelevant. This is not a determination for this court to make. The jury, as the trier of fact, is charged with weighing the evidence and determining the credibility of the witnesses. *Siguenza-Brito*, 235 Ill. 2d at 224-25. The jury heard the testimony and arguments of counsel regarding the street value of the inventoried narcotics and resolved that testimony in favor of the State. In any event, given the charge was delivery of a controlled substance and the majority's agreement there was a successful drug transaction, Officer Rattler submitted the narcotics that he received from defendant for testing, and testing revealed the presence of heroin.

¶ 60    The majority also devotes much of its discussion to the fact that the prerecorded $20 bill was not found on defendant when he was detained, stating that its absence "makes a perceptible difference on these facts." *Supra* ¶ 43. Why? If recovery of the marked funds is not necessary to prove the charge, then the failure to recover the marked funds means nothing. The majority knows this but conveniently ignores this basic legal proposition. Defendant made this argument to the jury and the jury was clearly not impressed. There are any number of reasonable inferences that could be drawn relating to why the money was not found on defendant: he gave it to a cohort, he left it with someone in the restaurant, he passed it off in the liquor store, or he dropped it because he suspected he just sold dope to an undercover police officer. Not finding the marked money on the defendant is meaningless. Whatever the reason the marked currency was not found on defendant during his arrest, the fact remains that the jury was convinced beyond a reasonable doubt, based on the testimony and the evidence, that the narcotics transaction Officer Rattler and the other officers described occurred.

¶ 61    Whether money was even passed in this drug transaction is not a legally material fact. The important factor is whether the transfer of possession of narcotics occurred. See *People v. Jordan*, 5 Ill. App. 3d 7, 13 (1972) (holding that in an unlawful sale of narcotics case, the important fact was the transfer of possession of a packet of heroin, and whether or not money was actually passed during the transaction was not a legally important fact). As the majority stated, defendant was charged and convicted of knowingly delivering a controlled substance. The elements of delivery of a controlled substance include that defendant had (1) knowledge of the presence of a controlled substance, (2) the controlled substance within his immediate control, and (3) the intent to deliver it. *People v. Rivas*, 302 Ill. App. 3d 421, 429-30 (1998);

720 ILCS 570/401(d)(i) (West 2016). Delivery of a controlled substance does not require that an exchange of money occur. In the instant case, the record shows that defendant transferred possession of heroin with the requisite intent. The fact that the pre-marked bill was not found on his person when he was arrested or that the alleged street value of the heroin exceeded the amount Officer Rattler paid defendant for it is irrelevant, particularly where the transfer of money or the value of the narcotic exchanged was unnecessary to convict him of delivery of a controlled substance.

¶ 62 Based on these facts, I do not agree with majority's decision to reverse defendant's conviction. Any deficiencies in the surveillance video should not be held against the prosecution especially where the delivery took place inside a building and the video was located across the street in an automobile. Importantly, while the video did not capture the actual transaction, it does not in any way contradict the testimony of Officer Rattler or any of the other witnesses.

¶ 63 Nor do I agree with majority's gratuitous commentary on police practices. It is not our duty as a court of review to sit in judgment of a police department's policy on enforcing the law, including eradicating drugs from our city. The majority denigrates the testimony that the officers were on an "investigation" in a "high narcotics area" and appears to attach some importance to the lack of evidence of "complaints or reports of criminal activity" with "no specific target" and instead describes important police work as nothing more than a "stumble into a successful buy based on pretense." *Supra* ¶¶ 44-45. One can imagine the majority's outrage if the State had attempted to tell the jury the level of illegal narcotic activity that caused them to focus on this area. While it recognizes that Officer Rattler made "a successful buy," the majority rewards the offender and disregards the 12 citizens who observed the witnesses, listened to the testimony, and unanimously found defendant guilty beyond a reasonable doubt. See *supra* ¶ 45. Incredibly, the majority finds Rattler's testimony unbelievable because it is better at arithmetic than he is. *Supra* ¶ 47. I missed that principle of appellate review. It concludes Rattler's identification was "not reliable" without explaining why and by ignoring the record. The majority fails to adhere to the undisputed principle of appellate review that we are required to affirm a conviction where, "viewing the evidence in the light most favorable to the State, ' "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis added.) *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *Collins*, 106 Ill. 2d at 261). There is simply no legal basis to reverse this conviction.

¶ 64 I respectfully dissent.