NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200057-U

NO. 4-20-0057

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 18, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| PAUL HARLAN, | ) | No. 17CF151 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding. |

_____

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The appellate court affirmed defendant's conviction and sentence for criminal
sexual assault.

¶ 2        In May 2017, defendant, Paul Harlan was charged by information with three

counts of criminal sexual assault, a Class 1 felony (counts I-III) (720 ILCS 5/11-1.20(a)(3) (West

2016)), and three counts of aggravated criminal sexual abuse, a Class 2 felony (counts IV-VI)

(*id.* § 11-1.60(d)). The State alleged, generally, that defendant committed acts of sexual

penetration with J.A., who was a minor and family member of defendant.

¶ 3        In November 2019, the trial court conducted defendant's bench trial. The State

called only J.A. to testify; defendant called several witnesses. At the conclusion of the evidence,

the court found defendant guilty of all counts.

¶ 4        The trial court later sentenced defendant to 8 years in prison on each of his three

convictions for criminal sexual assault and ordered those sentences to be served consecutively,

for an aggregate prison sentence of 24 years. The court also ordered the criminal sexual assault convictions merged with the aggravated criminal sexual abuse convictions.

¶ 5    Defendant appeals, arguing that (1) the evidence was insufficient for the trial court to convict him of criminal sexual assault and (2) defendant did not receive a fair trial because the trial court (a) based its judgment on facts not in evidence and (b) misrepresented the evidence when rendering judgment and sentence. We disagree and affirm.

¶ 6                           I. BACKGROUND

¶ 7                              A. Charges

¶ 8    In May 2017, the State charged defendant by information with three counts of criminal sexual assault (counts I-III) (720 ILCS 5/11-1.20(a)(3) (West 2016)) and three counts of aggravated criminal sexual abuse (counts IV-VI) (*id.* § 11-1.60(d)). Counts I through III alleged that between January 1, 2006, and December 31, 2008, defendant placed his penis in the vagina (count I), anus (count II), and mouth (count III) of J.A., who was under 18 years old and a family member of defendant. *Id.* § 11-1.20(a)(3). Counts IV through VI alleged that between the same time period defendant placed his penis in the vagina (count IV), anus (count V), and mouth (count VI) of J.A., while J.A. was between 13 and 17 years old and defendant was at least 5 years older than her. *Id.* § 11-1.60(d).

¶ 9                           B. The Bench Trial

¶ 10    In September 2018, defendant waived his right to a jury trial, and in May 2019, the trial court conducted defendant's bench trial at which the following evidence was presented.

¶ 11                         1. *The State's Evidence*

¶ 12    The State presented only the testimony of J.A., who testified that defendant was her uncle, married to her Aunt Beth, and she had known him her whole life. Throughout her

childhood, she visited her aunt and uncle's home in Blackstone, Illinois. At the age of 14, J.A. went to live with defendant and Beth because J.A.'s living conditions at her mother's house were extremely poor. At defendant's home, J.A. stayed in a basement bedroom, which was also a game room.

¶ 13 During J.A.'s first few months living with defendant, defendant regularly let her have alcohol and even made her alcoholic drinks. J.A. testified defendant would also "wrestle" with her and watch movies with her while she sat in his lap or cuddled. J.A. testified that, "a couple of months" after moving into defendant's house, in the summer of 2006, she had her first sexual encounter with defendant. J.A. stated that the sexual encounter occurred when she and defendant were in the living room watching a movie. J.A. was sitting in defendant's lap, and her cousins were sleeping on the floor. J.A.'s aunt was sleeping in her bedroom. J.A. had been drinking. J.A. testified that defendant rubbed her thigh and then carried her downstairs to her basement bedroom where he touched her breasts and thighs. Defendant took J.A.'s pants off, touched her vagina with his fingers, and then penetrated her with his penis.

¶ 14 Similar sexual encounters occurred over the ensuing two years while J.A. was between the ages of 13 and 15. J.A. testified that "[i]n the beginning, [the sexual intercourse] was probably every other night." J.A. testified that, for the most part, the sexual encounters happened at night in the basement bedroom of defendant's house but would occasionally happen at other locations, including on one occasion at the "house on Shabbona [Street] in Streator." J.A. described that defendant would engage in unprotected sex with her that usually involved vaginal penetration but also oral or anal penetration. Eventually, J.A. "started fighting back" and did her best to avoid defendant. When she fought with defendant, he would hold her down, choke her until she could not breathe, hold onto her wrists, and leave bruises. J.A. stated that this abuse

occurred from 2006 until 2008 when she gave birth to her son, at which time she moved in with her mother.

¶ 15　　　In 2016, a DNA test revealed that David Tyler Gammie was her son's father. J.A. testified that Gammie was her boyfriend at the time of the alleged abuse by defendant, though Gammie was 10 years older than she. J.A. testified that Gammie was the only person she told about the sexual abuse before she reported it to the police in 2016. Regarding her relationship with Gammie, J.A. testified that she met him through Beth when she was 13 and they began having sex shortly after meeting. However, J.A. acknowledged that in a July 2017 written statement to the La Salle County State Attorney's Office (La Salle statement), she wrote that she and Gammie began having sex a week before her fifteenth birthday, after she told him about defendant's abuse. J.A. testified that she did not tell anyone else about the abuse. She told only Gammie because "he made [her] feel safe, and he kept [defendant] away from [her]."

¶ 16　　　J.A. testified that Gammie would meet her at a ditch near defendant's house where she would sometimes hide from defendant. J.A. testified that she and Gammie would talk and sometimes have sex there. J.A. also said that she did not believe Gammie ever reported to anyone what she told him about defendant's sexually assaulting her.

¶ 17　　　J.A. further testified that, on one occasion, defendant sexually assaulted her at Gammie's father's house on Shabbona Street in Streator. However, on cross-examination, J.A. acknowledged that she wrote in the La Salle statement that defendant never bothered her when she was at the house on Shabbona Street. When asked whether what she wrote was a lie, she responded, "There's more to that." Thereafter she admitted that what she wrote was a lie.

¶ 18　　　J.A. testified to three specific instances of sexual abuse by defendant, the first being the encounter in defendant's basement, as earlier described. J.A. testified that the second

instance occurred one day while Gammie was working at her family's bar and defendant was there drinking. J.A. stated that Gammie messaged her to tell her that defendant left the bar and was drunk. Defendant came home, "pulled" J.A. into the downstairs room, removed her clothing, choked her, and began raping her. At that time, Gammie came into the house, yelled at defendant, and defendant chased Gammie through a cornfield outside. The third specific instance J.A. testified about involved another sexual encounter with defendant in the basement bedroom. Wesley, J.A.'s cousin and defendant's son, came downstairs while defendant was engaging in sexual contact with her. J.A. testified that defendant grabbed Wesley, dragged him upstairs, and put him to bed.

¶ 19 On cross-examination, J.A. testified that, despite defendant's conduct, she returned to defendant's house voluntarily because she was worried about her cousins. She stated, however, that she sometimes stayed at her mother's house or at Gammie's father's house on Shabbona Street. Regarding the years after the alleged abuse, J.A. testified that Gammie invited defendant to their daughter's fourth birthday party. She also acknowledged that defendant once babysat her son when he was an infant. J.A. also testified that in 2013 and 2016 she worked with defendant at a Kohl's distribution center in Ottawa, Illinois. She stated that, during breaks, she sat at the same table as defendant because Gammie also sat at the same table as defendant.

¶ 20 Defendant asked J.A. about an interview she had with Detective Renken from the Livingston County Sheriff's Department in January 2017. Defendant asked J.A. if she remembered telling Renken that she stayed at defendant's house beginning in sixth or seventh grade. J.A. responded, "Yes." Defendant then pointed out to J.A. that she was now testifying she began staying at defendant's house in the summer of 2006, when she was 14 years old. J.A. replied, "There's more to that, but yes."

¶ 21                                    2. *Defendant's Evidence*

¶ 22        Defendant chose not to testify but presented several witnesses who testified to the following.

¶ 23                                    a. Jarrod Witek

¶ 24        Jarrod Witek testified that he was employed as a police officer with the Streator Police Department. He stated that in October 2016, he interviewed J.A. regarding her allegations against defendant. J.A. told Witek that defendant began sexually assaulting her when she was 12 or 13 years old and continued until she was about 15 years old. She told him it began in 2005 and continued until July 2007. When asked if J.A. mentioned the Shabbona Street incident to him, Witek at first said J.A. had done so. However, when pressed by defendant, Witek explained that he thought that was what defense counsel had told Witek during the phone call made in preparation for testifying. After reviewing his report to refresh his recollection, Witek testified that the Shabbona Street incident was not mentioned in the report.

¶ 25                                    b. Derrick Renken

¶ 26        Derrick Renken testified that he was a detective employed by the Livingston County Sheriff's Department. He stated that in January 2017, he interviewed J.A. regarding a sexual assault allegation she made against defendant. Renkin testified that J.A. (1) told him she had resided consistently with defendant since she was 12 years old until the beginning of 2008 (when she was 16 years old) and (2) "alluded to" two incidents in which defendant assaulted her—one at the Shabbona Street residence and the other when Gammie "came in and [defendant] then chased [Gammie] out of the house through a corn field." According to Renken, these were the only instances that J.A. could recall. Renken stated that J.A. did not mention defendant giving her alcohol before having sex with her.

¶ 27                                              c. Tyler Gammie

¶ 28         Gammie testified that he had known defendant for about 13 years, having met him at a bar Gammie used to work at in Streator, Illinois. Gammie testified that Beth used to work with Gammie at the bar and he was closer friends with Beth than defendant. Gammie first met J.A. in February 2008, while she was drinking at the bar. He testified that when they met, he did not know her age or relationship to defendant. That same night, Gammie and J.A. had sex for the first time in the back room of the bar. Gammie next saw J.A. at a Rent-A-Center months later, and she was "visibly pregnant."

¶ 29         Gammie later stated that he did not actually remember the night he and J.A. had sex. Gammie attempted to explain that when he earlier testified that they had sex in February 2008, he based that date on J.A.'s having had a nine-month pregnancy with their son, who was born in November 2008.

¶ 30         Gammie testified further that, between 2005 and 2008, he never spent nights with J.A. outside defendant's house or had sex with her outside the house. Gammie also stated that J.A. never told him about any sexual abuse. Likewise, he testified that he never saw defendant having sex with J.A. and defendant never chased him into a cornfield. Gammie was unaware that defendant gave J.A. alcohol.

¶ 31         Gammie testified that after their first child was born in 2008, and J.A. was 17 years old, he and J.A. began dating for "three, four years." At the time, J.A. was living with her mother but later moved in with Gammie at his father's house on Shabbona Street. While they were dating, Gammie never observed any unusual bruises or marks on J.A. body, nor was he told about "an occasion where [defendant] came to [Gammie's] dad's house and beat and raped her."

¶ 32         In 2011, J.A. gave birth to their daughter. Gammie and J.A. broke up in 2013,

when J.A. was 21 years old. In 2015, J.A. and Gammie threw a birthday party for their daughter. Defendant appeared at the party. According to Gammie, J.A. had been in charge of the guest list. At the party, Gammie observed J.A. hug defendant and smile and laugh. That same year, defendant invited both Gammie and J.A. to his wedding. Gammie attended but J.A. did not.

¶ 33 Gammie also testified that, in July 2016, J.A. left their children at his house and admitted herself to the psychiatric ward at a hospital in Ottawa, Illinois. After J.A. was released, she wanted the children returned to her, but Gammie initiated custody proceedings and was awarded temporary custody of the children. Shortly thereafter, law enforcement officers employed by the Streator Police Department questioned Gammie regarding allegations of sexual assault against J.A.

¶ 34 d. Brandon Carr and Matthew Nederbo

¶ 35 Brandon Carr and Matthew Nederbo, defendant's coworkers at Kohl's, testified that J.A., who worked at Kohl's for less than a year in 2014 or 2015, would regularly sit with them and defendant during their breaks at work. They said that J.A. and defendant appeared to be friends and had normal interactions. They also testified that Gammie did not sit with them.

¶ 36 e. Wesley Harlan

¶ 37 Wesley Harlan, defendant's son, testified that he was born in 1997 and in the summer of 2006, he was nine years old. He testified that he never saw anything unusual happen between J.A. and defendant. Wesley testified that he did not recall a time in which he saw J.A. and defendant in the basement together and defendant dragged him by the arm back upstairs.

¶ 38 f. Michelle Harlan

¶ 39 Michelle Harlan, defendant's wife, testified that she worked at Kohl's with defendant and J.A. Michelle testified that she sat with defendant and J.A. during breaks.

Michelle stated that (1) J.A. and defendant were friendly with one another and (2) Gammie did not sit at the table with them. Michelle also testified that J.A. asked Michelle and defendant to babysit J.A.'s son when he was three or four years old. Michelle also recounted a time when she and defendant ran into J.A. in the grocery store. J.A. hugged defendant and Michelle and invited them to her daughter's fourth birthday party. Michelle and defendant attended the party, and J.A. greeted them in a similar way. Michelle testified she and defendant invited J.A. to their wedding in 2015. J.A. responded that she would attend, but J.A. did not attend.

¶ 40                                C. The Trial Court's Decision

¶ 41          The trial court began its oral ruling by stating the following:

> "The Court has an opportunity to review [the] testimony. *** I have not only had a chance to review the transcript, that partial transcript, but I also have my notes again which are very detailed. So, I'm very comfortable in the facts that I am going to find here and how the evidence, in my opinion what the evidence showed."

¶ 42           The trial court then remarked that the case "boils down to credibility" and discussed its findings regarding the credibility of defendant's witnesses, beginning with Gammie. The court stated as follows:

> "Tyler Gammie was called and relied on pretty heavily by the Defendant to contradict and rebut [J.A.'s] testimony particularly about the relationship that [J.A.] had with Mr. Gammie and the disclosures that she may or may not have made to him at that time.
>
> ***
>
> In regards to Tyler Gammie, he wasn't a credible witness. He was a

terrible witness. *** He was a horrible witness, and he was a biased witness. Obviously, as the State pointed out, he's involved in a contested custody proceeding or was involved in a contested custody proceeding with [J.A.] so surely he's not a friend of hers any longer; and he was very clearly taking advantage of [J.A.] during this time period. He tried to downplay his relationship and his friendship with the Defendant, and I think that Gammie did that in order to bolster his own testimony.

*  *  *

It's pretty clear that Gammie had his own hide to worry about. I have no doubt that he flat out lied to me, and quite frankly I think he should be charged with perjury. He's a liar, and that is the Defendant's strong witness.

*** [H]e just was a terrible, terrible witness. One of the worst witnesses I've ever seen."

¶ 43    Regarding J.A.'s testimony, the trial court found her to be "detailed, consistent, and sincere." The court viewed J.A.'s decisions between 2006 and 2008 in the context of her being 14 or 15 years old at the time, particularly her decision to continue residing at defendant's house. The court stated that J.A.'s providing testimony about defendant's sexual abuse "seemed very hard on her," noting that J.A. "shut down" during cross-examination. "And I think probably that's what happened during the time that this abuse was going on that she just shut down." The court further observed that even on cross-examination, J.A. "did not contradict herself."

¶ 44    Regarding J.A.'s motive for pressing charges against defendant, the trial court stated that "there absolutely is no motive here for her to make any of this up. She has no reason to fabricate any of this. She gains absolutely nothing, nothing by coming forward right now."

The court determined that J.A.'s acting friendly with defendant once she moved out of his house was not inconsistent with the allegations or her testimony.

> "[J]ust because she worked at the same place as the Defendant or was cordial to him in public or friendly with him in public, none of that means that all of this stuff didn't happen. *** The fact that she's trying to act normal and lead a normal life with her uncle it's not like it's some guy that lives in the neighborhood that she can just stay away from. It's her uncle."

¶ 45 The trial court did not find defendant's argument—that if, in fact, J.A. had been sexually abused, she would not have continued to live with defendant—persuasive. The court observed that, in light of J.A.'s age and the "horrible" conditions of her mother's house, "She's trying to go to a place where she can have some normalcy, and then she's taken advantage of by her uncle and his best friend." The court stated that inconsistencies in J.A.'s testimony with respect to dates of the sexual abuse were not significant because of the amount of time that had passed.

¶ 46 The trial court found that Renken's and Witek's testimony did not undermine J.A.'s testimony because the evidence was unclear as to what questions J.A. was asked. The questions the court knew J.A. was asked were vague and her answers were, for the most part, consistent with what she said at trial. "Those statements to law enforcement [(regarding the Shabbona Street incident)] and none of that [(the cornfield incident)] actually contradicts or impeaches her testimony." In addition, regarding Witek's testimony, the court found him less credible because during his testimony he "assumed whatever [defense counsel] told him on the phone" when asked about what J.A. had reported to him.

¶ 47 The trial court stated that it did not have any reason to doubt the testimony of

defendant's coworkers. However, it did not find Michelle credible because "[s]he is obviously a very biased witness since" defendant was her husband. The court also did not "put much weight on Wesley's testimony either given his age at the time all of this was happening and how much time has passed." The court continued, "But even if I believe all of the testimony from all of those folks, again it doesn't contradict or undermine the testimony of [J.A.]"

¶ 48        The trial court found defendant guilty of three counts of criminal sexual assault and three counts of aggravated criminal sexual abuse. The court ordered the aggravated criminal sexual abuse convictions merged with the criminal sexual assault convictions and, following a sentencing hearing, the court sentenced defendant to three consecutive terms of 8 years in prison, for an aggregate sentence of 24 years.

¶ 49        This appeal followed.

¶ 50                            II. ANALYSIS

¶ 51        Defendant appeals, arguing that (1) the evidence was insufficient for the trial court to convict him of criminal sexual assault and (2) defendant did not receive a fair trial because the trial court (a) based its judgment on facts not in evidence and (b) misrepresented the evidence when rendering judgment and sentence. We disagree and affirm.

¶ 52            A. Defendant Was Proved Guilty Beyond a Reasonable Doubt

¶ 53                        1. *The Applicable Law*

¶ 54        " 'The State bears the burden of proving each element of an offense beyond a reasonable doubt.' " *People v. Williams*, 2020 IL App (4th) 180554, ¶ 45, 167 N.E.3d 233 (quoting *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 54, 126 N.E.3d 703). "A person commits criminal sexual assault if that person [(1)] commits an act of sexual penetration and: *** [(2)] is a family member of the victim, and [(3)] the victim is under 18 years of age." 720

- 12 -

ILCS 5/11-1.20(a)(3) (West 2020).

¶ 55        "It remains the firm holding of [the Illinois Supreme Court] that the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228, 920 N.E.2d 233, 242 (2009).

¶ 56        A reviewing court will not "substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *Sturgeon*, 2019 IL App (4th) 170035, ¶ 55. Additionally, appellate courts draw all reasonable inferences in favor of the prosecution and "will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Cline*, 2022 IL 126383, ¶ 29. "A reviewing court will not reverse a defendant's conviction 'simply because there is contradictory evidence or because the defendant claims a witness was not credible.' " *Sturgeon*, 2019 IL App (4th) 170035, ¶ 56 (quoting *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 17, 985 N.E.2d 1047).

¶ 57                                    2. *This Case*

¶ 58        In the present case, defendant's only contention is that the State failed to prove that defendant committed acts of sexual penetration with J.A. Specifically, defendant argues that J.A., who was the State's only witness, was not credible because she was impeached at trial on key facts by her prior inconsistent statements regarding (1) the location of the abuse, (2) the first instance of the abuse, and (3) the time period during which the abuse took place. Defendant further argues that J.A.'s testimony was "contrary to human experience" when she alleged that (1) the abuse occurred in the house with her aunt and cousins present and (2) she continued to associate with defendant into her adulthood.

¶ 59        Reviewing J.A.'s testimony in the light most favorable to the State, we conclude

that the evidence was sufficient to support defendant's convictions for criminal sexual assault. Defendant argues that J.A.'s testimony was not credible because of alleged inconsistencies between her testimony and the prior statements she had given police, as well as with Gammie's testimony. However, credibility determinations are to be made by the trier of fact. *Sturgeon*, 2019 IL App (4th) 170035, ¶ 55. The trier of fact in the present case was the experienced trial court, which explicitly found J.A.'s testimony to be credible and explained its reasoning. "[T]he testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Wells*, 2019 IL App (1st) 163247, ¶ 23, 136 N.E.3d 1055. Further, a witness's inability to recall exact dates or times does not in itself create reasonable doubt but may instead affect the weight the court gives to her testimony. *People v. Nevilles*, 2021 IL App (1st) 191388, ¶ 59.

¶ 60      Because this court has no reason to disagree with the trial court's finding that J.A. was a credible witness, we conclude that J.A.'s testimony was sufficient to support defendant's convictions. J.A. testified that, when she was a teenager living in defendant's house, defendant repeatedly and regularly sexually assaulted her and engaged in oral, anal, and vaginal sex with her. As the trial court noted, nothing in the record showed that J.A. had any motive or reason to falsely accuse defendant of these offenses.

¶ 61      When one draws all reasonable inferences in favor of the State, none of the alleged "inconsistencies" defendant points to in J.A.'s testimony, were so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of defendant's guilt.

¶ 62      Much of defendant's argument, both at trial and on appeal, depends heavily on the testimony of Gammie to contradict and rebut J.A.'s testimony. But the experienced trial court determined, "[Gammie] was a terrible, terrible witness. One of the worst witnesses [the court]

- 14 -

ever [saw]." The record supports the court's assessment. Accordingly, we are not inclined to substitute our judgment for that of the court, which observed the live testimony of each of the witnesses. See *People v. Linscott*, 114 Ill. 2d 340, 354, 500 N.E.2d 420 (1986) (Clark, J., concurring) ("[Credibility] judgments[ ] *** rest heavily upon demeanor evidence unavailable to the reviewing court. We cannot hear the tremor in a witness'[s] voice or see the sweat on his palms.").

¶ 63 Further, regarding J.A.'s testimony being "contrary to human experience," the trial court found that J.A.'s testimony was hardly inconsistent with the allegations against defendant. Defendant contends that if J.A. was sexually abused, (1) she would not have later been friendly with defendant, (2) the abuse could not have occurred at defendant's family home while his family was present without being discovered, and (3) she would not have continued to live at defendant's house. We note defendant does not argue how these facts are inconsistent with sexual abuse, only that to believe such testimony is "illogical and unbelievable," a conclusion with which we do not agree. The court reasoned that J.A. was simply trying to live a normal life and as a 14- or 15-year-old victim of sexual abuse, she could not be "expected to make better decisions." The court's reasoning was not unreasonable.

¶ 64 Accordingly, we conclude that (1) the record supports the court's finding J.A.'s testimony credible and (2) the State provided sufficient evidence to convict defendant of criminal sexual assault.

¶ 65                    B. Defendant Was Not Denied a Fair Trial

¶ 66 Defendant next argues that the trial court erred by basing its "findings on matters of conjecture and speculation of matters not on the record." Initially, we note that defendant forfeited this claim on appeal because he did not preserve the issue by both objecting to the trial

- 15 -

court's findings at trial and raising the issue in a posttrial motion. See *People v. Williams*, 2022 IL 126918, ¶ 48 ("To preserve a purported error for appellate review, a defendant must object to the error at trial and raise the error in a posttrial motion."). However, defendant contends that we can review the claim as either first-prong or second-prong plain error.

¶ 67 Appellate courts may review a defendant's forfeited claim under the plain-error doctrine in either one of the following two instances:

"(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Walker*, 2021 IL App (4th) 190073, ¶ 17 (quoting *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675).

The usual first question to address under either prong of plain-error doctrine is whether clear or obvious error occurred at all. *Id.* If not, then the plain-error doctrine does not apply. *Id.*

¶ 68 In the present case, defendant asserts numerous instances of alleged error in the trial court's ruling but, upon our review of the record, we conclude that each of these alleged errors is simply defendant's splitting hairs, parsing through a cold record for the slightest semantic irregularity, and inviting us to second-guess the trial court's well-founded inferences and credibility assessments so that defendant might have a second bite at the apple. We emphatically decline defendant's invitation.

¶ 69 We recognize that "[a] trial court's failure to recall and consider testimony that is crucial to the defense may violate the defendant's right to due process." *People v. Williams*, 2017

IL App (1st) 150795, ¶ 39, 87 N.E.3d 353. However, a trial court's "minor misstatement" of evidence that did not affect the basis of the court's ruling does not violate due process. *Id.* Further, a trial court is presumed to know the law and "may draw or reject inferences based on the evidence" before it. *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 72, 104 N.E.3d 1251.

¶ 70    In the present case, the trial court's inferences and credibility determinations were soundly based in the trial record. Defendant provides no affirmative indication that the court failed to consider, failed to remember, or misremembered any evidence that went to the crux of defendant's defense; instead, defendant's argument relates primarily to impeachment evidence.

¶ 71    In closing, we thank the trial court for providing a thorough record for review, which detailed (1) its decision, (2) its reasoning underlying that decision, and (3) its findings regarding what the evidence showed and the credibility of the witnesses.

¶ 72                              III. CONCLUSION

¶ 73    For the reasons stated, we affirm the trial court's judgment.

¶ 74    Affirmed.